ARMROYD and another *against* The UNION INSURANCE COMPANY.

CASE. " The plaintiffs effected insurance at the office of the defendants on the 28th of *September* 1803, by a policy on the brig *Fair American*, of which they were owners, for 5000 dollars, and a policy on her cargo for 10,900 dollars, on a voyage from *Philadelphia* to *Barbadoes*. There was no insurance on *freight*.

" The brig with her cargo sailed from *Philadelphia* on the 23d *September* 1803, on the voyage insured; but meeting with tempestuous weather, she was forced to bear away for *Antigua*, where upon a survey she was condemned and sold for the benefit of the concerned, and the voyage broken up. The cargo being landed, was sold for the benefit of the concerned, and the proceeds of sale both of vessel and cargo were paid on the 24th *December* 1803 to the supercargo of the vessel, neither the plaintiffs nor the defendants having any special agent at *Antigua*. The amount of the sales was doned ship and goods, and recovered a verdict for a total loss in each case; but in adjusting the loss, they claimed to deduct out of the net proceeds of the goods which were to be credited to the underwriter, a *pro rata freight* to *Antigua*. Held that no freight *pro rata* was due.

*Qu.* Whether if a *pro rata* freight had been due, it would have belonged to the underwriter on ship by the abandonment, or to the owner of the ship, who had stood his own insurer as to freight.

1811.

BEALE
*v.*
DOUGHERTY.

*Philadelphia,*
*Monday,*
*July 22.*

Ship and goods belonging to the same owners were insured from *Philadelphia* to *Barbadoes*, but the vessel by stress of weather was compelled to put into *Antigua*, where she was condemned and sold and the voyage broken up. The goods were likewise sold; and the net proceeds of both were paid to the supercargo. The assured aban-

1811.

ARMROYD
*v*
UNION
INS. COMPANY

afterwards invested in bills, on which a profit arose to the interested, and the bills being remitted to the plaintiffs, they accounted for the principal and profit, to the defendants, on the recovery for a total loss herein after stated, abating a commission of —— per cent. for the negotiation.

" As soon as the plaintiffs heard of the situation of the vessel and cargo at *Antigua*, but before they had heard of the actual condemnation and sale, they determined to abandon and to claim as for a total loss. They accordingly wrote a letter of abandonment to the defendants dated 16th *December* 1803. On the 31st *December* 1803, they exhibited at the office of the defendants copies of the protest and survey, and on the 4th *February* 1804 they exhibited a formal cession with proofs of property. Upon this abandonment, which was never varied nor relinquished, the plaintiffs recovered a total loss on both policies, by a verdict and judgment of the Supreme Court, and the defendants have paid the amount. But the plaintiffs claim also to be paid by the defendants, freight for the goods; and

" The question for the consideration of the court, is whether any and what freight under the circumstances of this case is due from the defendants to the plaintiffs. The papers read on the trial to be used by either party, and the statement in 2 *Binney's Reports*, p. 394., to be taken as part of the case. The decision of the court to settle the rights of the parties."

*Gibson* and *Tilghman* for the plaintiffs. The plaintiffs, although owners of ship and cargo insured by the defendants, stood their own insurers as to freight. It is the same case therefore as if freight had been insured, and not abandoned. The owner is intitled to a *pro rata* freight earned before he transferred his vessel; and hence in accounting to the underwriters on goods for the proceeds of vessel and cargo, we claim a right to deduct the freight for which these goods were liable. The inquiries then are,

1. Whether the ship owners, under the circumstances of the case, earned a *pro rata* freight; and if so, whether the right to it exists against the underwriters on goods.

2. Whether the freight belongs to the ship owners, or to the underwriters on ship, by virtue of the abandonment.

1. Freight *pro rata* is in all cases due in equity to the ship owner, where a part of the voyage has been performed, and the interruption is not attributable to his fault or misconduct. *Lutwidge* v. *Grey*, (*a*) and *Luke* v. *Lyde*, (*b*) establish the principle, that if a vessel be driven into an intermediate port, and the captain chooses to refit her or hire another, he is intitled to his whole freight; but if he will not refit or hire another, still he is intitled to a *pro rata* freight. The owner if he takes his goods must pay it; and if he will not take them, the captain has a lien upon them for his freight, and may sell them as abandoned by the owner. In *Lutwidge* v. *Grey*, the master was held to be intitled to freight *pro rata* to *Youghall*, where the vessel was shipwrecked, although he refused to carry the goods on to *Glasgow* the port of destination, and they were sent thither in another vessel by the proprietors. In *Luke* v. *Lyde*, lord *Mansfield* says " there " can be no doubt that some freight is due, for the goods " were not *abandoned* by the freighter, but received by him " of the recaptor;" and in the same case, " if the merchant " *does not desire* the master to provide another ship, he is " still intitled to a proportion, *pro rata*." 2 *Burr*. 888. The later cases do in some measure put it upon the ground of an *acceptance* of the goods by the owner; but this acceptance is of no moment intrinsically; for if he will not accept his goods, he must *abandon* them, and if he abandons them, the master has the entire goods, and with them the only security which the marine law gives him for his freight. But take it upon the footing of an acceptance. Certainly there was an acceptance here. The supercargo, whose acts in relation to the cargo are those of the owner, did not desire the master to carry on the goods to *Barbadoes*. He accepted them at *Antigua*, sold them and received the proceeds; and therefore every circumstance exists which intitles the master to a *pro rata* freight. That this title exists as against the underwriter on goods, is very plain, if it exists at all. The acts of the supercargo subsequent to the condemnation at *Antigua*, are for

(*a*) *Abbot on Ship*. 194.        (*b*) 2 *Burr*. 882.

the account of the underwriters by virtue of the abandon-ment; and they have in fact ratified them by taking the pro-fit on the bills of exchange. His consent binds them. From the moment that freight is earned, the master has a lien upon the goods for its amount, and no transfer of the pro-perty to underwriters can remove the incumbrance. We do not claim it of them *quâ* underwriters, but as assignees of the property by abandonment. We still retain the proceeds, and with it our lien, which we have a right to inforce by the deduction claimed.

2. If freight was earned, it belongs to the owner of ship, and not to the underwriter on ship. In the first place there is no equity in giving it to the latter. He did not insure it, and would not have paid for it had it been lost; of course he is not intitled to that part of it which is saved. In the next place, the argument which gives it to the underwriter on ship, proceeds upon the ground that freight is an incident in-separable from the ship; whereas a striking peculiarity of the *English* law of insurance consists in the very separation of ship and freight, which is made for the purposes of insu-rance. If they are distinct for the purposes of insurance, they must be so for the purpose of abandonment. Again, the argument is fallacious in supposing the freight not be earned until the conclusion of the voyage, before which the underwriter becomes a purchaser by the abandonment; whereas the freight was earned in this case before the aban-donment or the loss to which it relates. The loss took place at *Antigua*, because it was the expensiveness of repairs *at that place*, which in connexion with prior disasters, consti-tuted the loss; and the freight *pro rata* was earned before that fact was ascertained. If however the loss was on the 24th *October*, the day of the severest gale, still in equity freight up to that time should be considered as belonging to the owner. So far his funds earned it, in the purchase of provisions, and the hire of seamen, in a much greater pro-portion than it was earned by the wear and tear of the ship. So it universally is; and therefore in all cases it would be a dictate of the clearest equity to apportion the freight accord-ing to the time employed, or the distance performed of the voyage. Any other course would in a great majority of

cases make the underwriter a gainer by the loss of the vessel, and the owner a loser by recurring to his policy on her. The point has been thus settled in *New York*, in *The United Insurance Company* v. *Lenox* (a), *Davy* v. *Hallet* (b), and *Mumford* v. *Hallet* (c); and so in substance it was in *Luke* v. *Lyde*, in which case the owner of the ship sued for and recovered the freight after he had abandoned the ship to the underwriter; whereas by the opposite doctrine the underwriter on ship was alone intitled. The same principle prevailed in *Livingston* v. *The Columbian Insurance Company.* (d) In fact while the question was considered with a reference to the fundamental principles of the *English* law of insurance, and to practical consequences, there could be no doubt; it is only by metaphysical arguments, confounding the freight with the ship, and treating it as a mere incident, that a doubt has been raised by late judges in *England.* Their tendency is undoubtedly to bring us to the *French* law upon this subject.

*Dallas* and *Ingersoll* for the defendants. There can be no action against this company to recover freight, but an action of covenant, for they contract by deed only; but still if the plaintiffs would have a right to recover against any person, and in any form, let them recover.

1. No freight *pro rata* was due when the voyage was broken up. 2. If any was due, it passed by the abandonment to the underwriter on ship, by relation either to the commencement of the voyage, or the time of loss.

The material facts are these. The vessel received her death wound some weeks before her arrival at *Antigua*. She arrived a mere wreck, and all subsequent proceedings were with a view merely to ascertain the effects of the storm, and to furnish evidence of them. In relation to agency, the underwriters had no agent at *Antigua* competent to make a contract for them. No offer was made to carry the goods to *Barbadoes*, nor was the carriage of them thither, dispensed with by the company. The goods were necessarily and in-

1811.

ARMROYD
v.
UNION
INS. COMPANY

(a) 1 *Johns. Ca.* 377.     (c) 1 *Johns.* 433.
(b) 3 *Caines* 16.     (d) 3 *Johns.* 55.

1811.

ARMROYD
v.
UNION
INS. COMPANY

voluntarily landed and sold, before the abandonment was made.

1. We assert the general rule to be, that no freight is due on a contract for the delivery of goods, unless they are delivered at the port of destination, or the owner of the goods refuses to send them on in another vessel, the first being incapacitated. The rule has one and only one exception, where the owner of the goods accepts them at an intermediate port without compulsion; in which case freight *pro rata itineris* is due upon the foundation of a new contract, which the law implies from the acceptance. *Luke* v. *Lyde* was for some time thought to have settled a much broader exception to the general rule; but it is now perfectly understood in *England*, that the *acceptance* of the cargo was the basis of that decision, and that without it, there is no freight *pro rata*. *Mulloy* v. *Backer* (a), *Hunter* v. *Prinsep* (b), *Liddard* v. *Lopes* (c), *Cooke* v. *Jennings* (d), *Christy* v. *Row* (e). And it must be a voluntary acceptance; for if the goods are received by compulsion, or because there is no alternative but to take them or lose them altogether, there is no freight due. *Hurtin* v. *Union Insurance Company*. (f) But granting that there was in the present case an acceptance which would charge the owner with the freight, still the underwriter has nothing to do with it. The owner is liable only in virtue of a new contract, which cannot be transferred to the underwriter. As to *lien*, there is none, for the new contract arises only upon *acceptance* of the goods; and by the delivery to the owner, which must be at the same time with the acceptance, the lien is at an end; or if not by such a delivery, certainly by the delivery to the underwriter or the person acting as his agent. If the consignee of goods sell them before they are landed, he and not the buyer is liable for the freight, though the latter enter them at the customhouse. *Artaza* v. *Smallpiece*. (g) If then, in the character of assignee the defendants are not liable, still less are they as underwriters on goods, for they have not insured the freight, nor engaged to indemnify the owner of goods against the payment of it. *Baillie* v. *Modigliani* (h), and *Gibson* v. *The Philadelphia Insurance Com-*

(a) 5 *East*, 316.     (d) 7 *D. & E.* 381.      (g) 1 *Esp.* 23.
(b) 10 *East*, 378.    (e) 1 *Taunton*, 300.    (h) *Park.* 53. 2 *Marsh.* 728.
(c) 10 *East*, 526.    (f) 1 *Condy's Marsh.* 281.

*pany* (*a*), are in point. In fact, by such a state of things as justifies an abandonment of goods to the underwriter, all contracts relative to freight are dissolved by the act of God, and the underwriter of course cannot be bound to pay any thing for freight, which arises exclusively from contract. 2 *Emerig.* 194. 196., *Pothier* 113., *The Hiram.* (*b*)

2. The clear inclination of the courts in *England*, is to give the freight to the underwriter on ship. The abandonment relates to the time of loss, which in this case was the gale of the 26th of *October*, or *eo instanti* that the vessel reached *Antigua*. From that moment by relation she was the property of the underwriters. The expenses from that time fall upon them; *Thompson* v. *Rowcroft* (*c*), *Leatham* v. *Terry* (*d*), *Sharp* v. *Gladstone* (*e*), *M'Arthy* v. *Abel* (*f*); and every advantage thereafter accruing from the possession of her, belongs to them alone. At the time of the loss it cannot with any colour of propriety be argued that freight was earned. It was all *inchoate.* It depended upon prosecuting the voyage to *Barbadoes*, or upon acceptance of the cargo at *Antigua;* neither of which could at that time be known. If they had taken place thereafter, it would have been while the ship belonged to the underwriters, and when every thing in relation to freight would concern them and not the former owner. The underwriters had become purchasers prior to any freight being due. They took the vessel with this as an accruing interest; and it cannot be said more than in the case of a ship sold at sea, that the freight is to be divided according to the proportion of the voyage passed at the moment of sale. How is it to be distinguished from an insurance on goods, the profits of which are also or may be insured? If the goods are abandoned, so are the profits. They cannot be retained *in toto*, nor apportioned. The circumstance that freight is distinct for the purpose of insurance, proves nothing. So are profits. The question is, are ship and freight so distinct, that by transferring the ship, freight, which is a recompense for the future as well as the past use of her, will not be transferred also; and there is no authority for such a po-

(*a*) 1 *Binn.* 414.   (*c*) 4 *East*, 44.   (*e*) 7 *East*, 29.
(*b*) 3 *Rob.* 150.   (*d*) 4 *Bos. & Pull.* 479.   (*f*) 7 *East*, 388.

sition. Indeed the equity of the case is with the underwriter. He must go on to earn the freight at his own expense after abandonment, and before abandonment it was in a considerable degree earned by the wear and tear of the vessel, and by disbursements at the outset which are included in her valuation, such as a month's pay to the hands, and part of the provisions. The *New York* decisions have arisen out of a case in which the court was nearly divided, and they have become uniform now, only from deference to this precedent.

TILGHMAN C. J. The plaintiffs claim an allowance for freight, to which they say they are intitled, because it was earned before their abandonment of the ship to the defendants. The goods were to be carried from *Philadelphia* to *Barbadoes*, so that freight would not be due till the delivery at *Barbadoes*. But they never were carried to *Barbadoes;* therefore, upon the original contract, the freight was not earned. It is contended however, that by the marine law, freight is due *pro rata itineris*, although the voyage was but in part performed; and in support of this the case of *Luke* v. *Lyde* is relied on, 2 *Bur.* 883. That case has been so frequently cited, that it has attracted the particular attention of the courts, and it is now understood to have turned on the circumstance of the freighter having *accepted* the goods, at the port to which they were carried after a capture and recapture. So says lord *Ellenborough* in *Liddard* v. *Lopez*, 10 *East* 529., and the reason of the thing proves that he is right. If one contracts to carry my goods from *Philadelphia* to *Barbadoes*, for which I agree to give him a certain price, and he being driven to *Antigua* by stress of weather, offers to carry them on to *Barbadoes*, and I refuse, in that case he is intitled to the *whole* freight, because I am the cause of the contract not being performed. On the other hand, if I ask him to carry them on, and he refuses, in consequence of which the goods are delivered at *Antigua*, he is intitled to no freight, because he has not performed his contract. It would be most unreasonable if he should; for it might happen, that the freight from *Antigua* to *Barbadoes*, (I mention those places only by way of example) would be more than from *Philadelphia* to *Barbadoes*, as was actually

the case in *Luke* v. *Lyde*, where the freight from *Biddeford* to *Lisbon*, is stated as being more than from *Newfoundland* to *Lisbon*. But it may happen, that the freighter may find it his interest to accept the goods at some other port than that of delivery. In that case, it would be just that he should pay freight *pro rata*. But this would be a *new* contract; and if he accepts the goods, without expressly contracting to pay freight, the law will imply a contract. Thus it seems to me, that the law is now settled upon fair and solid ground, for which I refer to the cases of *Cooke* v. *Jennings*, 7 *D. & E.* 381., and *Liddard* v. *Lopez*, 10 *East* 526.

In order to raise this implication of a *new* contract, it is necessary that the goods should be accepted by the freighter or his **agent** *voluntarily;* for if they are in that situation, that the agent or supercargo takes them against his will, and sells them for the benefit of whom it may concern, no freight can be recovered. Such was the case of *Hurtin* v. *The Union Insurance Company*, in the Circuit Court of the *United States* for this district. *Cond. Marsh.* 281. 601. There a ship bound from *New York* to *Gibraltar*, was taken by the *Spaniards* and carried to *Algesiras;* and the *Spanish* government consented, that the captain might depart with the ship and cargo, giving bond not to go to any *British* port in the *Mediterranean.* The supercargo under these circumstances thought it best to sell the cargo, and Judge *Washington* was of opinion that no freight was demandable. In the case now before the court, the plaintiffs were owners of both ship and cargo; and they charge the defendants with freight, as coming to the owner of the ship from the defendants, who have become owners of the goods by virtue of the abandonment to them. This presents a singular aspect, not quite similar to any case that has been cited. It must be decided on the principles which have been mentioned. If the defendants could be considered as having acquired the property and possession of the goods by purchase, after the freight was earned, supposing any to be earned, they could not be chargeable with it unless they had so specially agreed. But the plaintiffs contend, that the defendants must be taken as standing in their place. Consider it how you will, it appears to me that the defendants ought not to be chargeable with freight, because they

1811.

ARMROYD

v.

UNION
INS. COMPANY

never had an opportunity of making their election to accept the goods at *Antigua*, or have them carried on to *Barbadoes*. The plaintiffs being owners of both ship and cargo, had the ball in their own hands; and without pretending that they ever had the most distant idea of carrying the goods to the port of delivery, or that the defendants had any choice in the business, they demand freight *pro rata*. It is no answer to the defendants' objection, to say, that they have ratified the sale of the goods by accepting the proceeds. What else could they do? If they had refused the proceeds, they might have got nothing. They never were consulted about the sale. In fact the sale had been made before the abandonment. It is too much to say, that the bare receipt of the money under these circumstances should amount to such a recognition of the sale, as would burthen the defendants with freight, to which they would not otherwise have been liable. The goodness or badness of the price for which the goods sold was immaterial. In *Liddard* v. *Lopez*, the freighters refused to accept the goods charged with freight, and it was agreed that they should be sold without prejudice to either party. They produced a handsome profit, and the freighter received the proceeds, but yet it was held that no freight was due. Considering the case before us under all its circumstances, there does not appear to have been any consent of the defendants to accept the goods at *Antigua* either express, or fairly to be implied. I am therefore of opinion, that no freight can be recovered.

YEATES J. The plaintiffs were owners of the brig " *Fair American*" and her cargo, both of which were insured on her voyage from *Philadelphia* to *Barbadoes*. No insurance was made on the freight, and consequently the plaintiffs stood their own insurers as to the freight: but it has been correctly admitted on the argument, that they are intitled to every legal right and benefit, which insurers on freight could possibly claim.

The first question which presents itself, is whether the plaintiffs are intitled to any part of the freight on the goods landed at *Antigua*.

The brig sailed from *Philadelphia* on the 26th *September*

1803, but on the 1st and 6th days of *October* she experienced violent gales of wind, which greatly increased on the 24th, and laid her on her beam ends. The crew to save their lives, found themselves under the necessity of cutting away her main mast and rigging, and discharging her load on deck. The vessel afterwards leaked greatly, and with much difficulty reached the island of *Antigua* on the 11th *November*. The remnant of the cargo was there sold at a good profit by the supercargo for the benefit of the concerned. Neither the plaintiffs nor defendants had any special agent in *Antigua*. The amount of the sales was afterwards invested in bills of exchange, on which a profit arose to the interested; and the bills being remitted to the plaintiffs, they accounted for the principal and profits to the defendants, on the recovery for a total loss, abating a commission for the negotiation.

The defendants do not place their claim to exoneration on the technical ground, that no action would lie against them for this demand, as an incorporated body, except in covenant under their common seal. They judiciously agree, that if a recovery could be had against private individuals in any form of action under the circumstances of the case, they are willing to share the same fate. But they contend that no authority has been or can be shewn, to ascertain that freight in general is payable until the goods are delivered at the destined port, or to fix the liability of the owners of goods to the payment of a ratable freight, unless where they have hindered the owner of the ship, after the occurrence of the event which has frustrated the voyage, from transporting them to the place of destination, or where some new contract has not either been expressly made, or may fairly be inferred from the circumstances of the case, for the apportionment of the freight. *Lutwidge* v. *Gray*, *Abbot* 249. 1st ed., *Luke* v. *Lyde*, 2 *Burr*. 882., and *Christy* v. *Row*, *Taunt*. 300., were decided on these grounds. Indeed in *Cooke* v. *Jennings*, 7 *T. R.* 381., in covenant on a charter party, the freighters were held not to be liable for freight unless the full voyage were performed, or a new contract made, though they received the goods at an intermediate place after the ship was wrecked; and it was said by the court that it was of no moment, whether the contract was under seal or not.

ARMROYD
v.
UNION
INS. COMPANY

1811.

But in the case before the court, it is said there was no voluntary act of the defendants or of any one in their behalf, accepting the goods at *Antigua.* No option or opportunity of making any choice was offered to them on the occasion. As to the common clause inserted in every policy, whereby the party insured is authorized in case of any loss or misfortune, " to sue, labour, and travel without prejudice to " the insurance," it only means, that until the insured have been informed of what has happened, and have had an opportunity of exercising their own judgment, no act done by the master shall prejudice the right of abandonment of the insured. The loss happens generally at a distance, and they cannot exercise their judgment immediately; it is therefore necessary, that the master who is on the spot, shall do the best he can. *Mitchell* v. *Edie,* 1 *Term Rep.* 613. The supercargo here was the agent of the insured, and intrusted by them; but his acts cannot bind the underwriters. Besides, the captain had a right to retain the goods shipped on board his vessel, till the freight was paid, but when he parted with the possession of them, he could only resort to his contract. *Artaza* v. *Smallpiece,* 1 *Espin. Ca.* 24.

To this it is answered, and in my idea with much correctness, that ratable freight is due under the circumstances of the case, on principles of equity and reason as well as law. It is fully admitted, that in general, freight is not demandable by the ship owner or his captain, unless the goods are transported to their place of destination, according to the tenor of the bills of lading. But the commercial law seems equally well settled, that if the vessel be disabled from completing her voyage, the shipholder may still intitle himself to the whole freight by forwarding the goods by some other means to the place of destination, unless the forwarding them be dispensed with, or unless there be some new bargain on the subject. *Hunter* v. *Prinsep,* 10 *East* 393.

The case of *Cooke* v. *Jennings,* cited by the defendants' counsel, turned on the point of its being an action of covenant founded on the original charter party as an entire contract, and is thus distinguished from *Luke* v. *Lyde,* which was the case of a general assumpsit for the freight of goods, founded on the marine law. The technical objection there

taken, has been expressly waived here. *Lawrence* justice, **1811.**
recognises the law on the subject, and says the subsequent
receipt of the goods by the insurer, might be evidence of a
new contract between the parties. The question then is re-
duced to this, have the defendants by the instrumentality of
their agents, dispensed with the forwarding the remnant of
the goods laden on board, to *Barbadoes?* If they have so
done, freight *pro rata* is demandable.

ARMROYD
*v.*
UNION
INS. COMPANY

It has been frequently observed, that though the master
be the general agent of the shipowners, yet in case of extra-
ordinary calamity, he must also be considered as the agent
of the owners of the goods, who have intrusted them to his
care, so as to bind them. The same remark is applicable to
a supercargo, as between him and the underwriters; and
more especially if it shall be established, that the abandon-
ment has a retrospective effect to the period, when the vessel
insured received her death wound. But the plaintiffs are
under no necessity of relying on this reasoning by analogy.
Here was a substitution of money for the goods sold for the
benefit of the parties concerned, which was equivalent to an
actual restitution of the goods themselves. The accepted
substitute inuring for the defendants' benefit afterwards, re-
quired no further conveyance, and must be considered as
virtually dispensing with the ulterior duty of the shipowners,
which would have remained to be performed, if the mer-
chandise had remained in its specific state. The defendants
have clearly adopted the acts of the supercargo, as their
agent, by receiving the proceeds of sale, and insisting that
the profits of the bills of exchange in which the sales were
invested belonged to themselves, after deducting a small
commission for the negotiation. This brings the case with-
in the principle of the decisions cited. The goods were not
*abandoned* by the owners at *Antigua,* according to lord *Mans-
field's* expressions in *Luke* v. *Lyde,* 2 *Burr.* 888.; and in
*Mackrell* v. *Symond, Abb.* 266., he says, " if the ship be cast
" away on the coast of *England,* and never arrive at the port
" of *London,* yet if the goods are saved, freight shall be paid,
" because *the merchant receives advantage from* the voyage:
" it is not expressed in the charter party, but arises out of

1811.

ARMROYD
v.
UNION
INS. COMPANY

" the equity of the case." This doctrine rests on a broad and reasonable basis. See *Scott* v. *Libby et al.*, 2 *Johns.* 341.

Instead of the plaintiffs having parted with their lien on the goods, the real contest now is, what ought to be the extent of the credit allowed to the defendants upon the recovery against them for a total loss on *both policies*, which is not yet ascertained. The defendants claim the full amount of the proceeds of sale, and the profits on the bills with a small abatement for commission; and the plaintiffs insist that a *pro rata* freight for the merchandise should be deducted. I conclude for the reasons, which have been stated, that the plaintiffs standing their own insurers for the freight, are in that capacity intitled to a ratable proportion thereof.

What that ratable proportion should be, depends on the legal operation of the act of abandonment, whether it relates to the inception of the voyage, the occurrence of the accident, or the time of the cession. The *English* books inform us, that when an abandonment is made, the insurers succeed to all the rights of the insured; but I have not met one decided case in them, which precisely ascertains to what period of time it shall have relation. That the future earnings of a ship insured and abandoned belong solely to the underwriters, there can be no doubt. It would seem that by the *French* law, an abandonment has a retrospective effect from the beginning of the voyage, and that the insurers are supposed to have had the property from that period. 2 *Emerig.* 196. 223. 224. In the Supreme Court of *New York* in *April* term 1800, it was determined, that upon abandonment of the vessel, the owner of the freight being also owner of the vessel, did not thereby abandon his freight *in toto*, but that he retained a certain part to be apportioned *pro rata itineris*, and consequently to be carried down to the time *when the loss happened. United Insurance Company* v. *Lenox*, 1 *Johns. Ca.* 377. This decision was affirmed in the court for correction of errors in 1801, and was afterwards recognised and confirmed by all the judges of the Supreme Court in *May* term 1805, in *Davy* v. *Hallet*, 3 *Caines* 20. I concur therein for the reasons assigned by the judges of that court; and therefore upon the whole matter I am of opinion, that the plaintiffs are intitled to a ratable part of the freight earned on

the 26th *October* 1803, the time when the brig is supposed to have received her death wound in the course of the voyage.

BRACKENRIDGE J. In the contract of *carrying*, there is an implied undertaking to carry safely to the place of *destination*. The owner taking the goods from the carrier at an intermediate place, may be considered as dispensing with the carrying to the place of *destination*, and as bound to pay for the *carrying performed*, what, taking all things into view, the carrying so far may seem to be *reasonably worth*. This, if not settled by express agreement on the accepting the goods from the carrier short of the place of destination, must in all cases be a matter of *estimation*, for which there is nothing certain to guide in fixing the sum, but which must depend merely on a consideration of what such carrying may be reasonably worth; and this must depend on the taking into view every circumstance of disadvantage under which the goods are accepted. The *pro rata* cannot be the proportion of the distance run to the distance originally destined, throwing out of the calculation the distance of deviation from the direct course from which the ship may have borne away to reach a port. It will not do to say, *as the whole voyage is to the whole freight agreed upon, so this part of the voyage to the part freight*. The disadvantage under which the goods are accepted must be taken into view. Under circumstances, it may be unreasonable that the owner of the goods pay *any freight*, his loss being greater than the *pro rata* freight earned. It may be better for the carrier, or those who represent him, to have the goods taken off their hands, than to be obliged to repair the wreck or procure another vessel. What control in that case has the owner of the goods over the *assurer*, to compel him to repair the vessel, or to procure another? His contract, (the owner of the goods) was with the *original carrier*. Must he not look to him for his remedy? What control has the original carrier, the assured, over the assurer who becomes the carrier, to compel him to repair the vessel, or procure another? What right of action can he have against him if he refuses to repair in a reasonable time, or to procure another vessel? If he cannot have

the freight earned, as well as that to be earned, it may be a loss to him to go on with the carrying, and in such case he can have no inducement to complete the voyage, which seems the only hold that the assured, after abandonment, can have upon him, to induce him to fulfil the contract of carrying in his stead; and for which contract, he the assured must be answerable *to the owner of the goods.* Admitting that the assured has a right of action against the insurer on an implied undertaking to complete the voyage, is it not better that the interest he may have in completing the voyage should serve instead of legal compulsion, and secure a fulfilment? It would seem to be taken for granted in all cases, that the assurer when he takes the abandoned vessel will go on with the voyage. *This goes to prove the understanding of the parties that it cannot but be his interest to earn the freight;* but it may not in all cases be his interest, unless he is allowed the whole freight, *that earned and to be earned; ergo,* as the logicians would say, *it is the understanding of the parties,* and it is a reasonable understanding, and for the mutual interest of assurer and assured, and is the simplest rule, and the only one easily practicable. In that case he only who lets out his ship to hire for a voyage, or in the language of the merchants, charters it out, *will insure for freight;* in which case, on abandoning the freight, he has the whole to abandon, and the insurer makes good the whole, and takes the *pro rata,* if any has been earned, or the whole if earned, subject to the expenses incurred; which may reduce the freight to very little, *and furnishes a reason why he should have the whole.*

I have said that it is a matter *of difficulty* to settle the *quantum meruit* of a part performed carrying. I would rather say that it is *an absolute impracticability* to reach justice in such a case, from the want of an exact standard of valuation; which uncertainty ought to be avoided, by adopting such a rule as will *reduce* the cases. These cases are reduced, by considering *the assurer as stepping into the place of the assured,* so as to be intitled to the whole freight *from the commencement of the carrying.* In that case the assurer at the time of insurance will look to the being intitled to the whole freight, or hire of carrying, if the ship should at any

time in the course of the voyage be abandoned to him; and he will reduce his demand of premium accordingly. The assured on his part will take the same thing into view; and, the premium being adjusted on this ground, it comes to the same thing as between these, and the only question will be, *which is the simplest and most convenient rule?*

1811.

ARMROYD
*v.*
UNION
INS. COMPANY

It must lie with the assurer on abandonment, supposing him present, *to* say, whether he will repair the vessel or provide another, so as to complete the carrying and be intitled to the whole freight, or to take the goods and pay for them, and give up the freight *in toto;* for he has now become the carrier. The carrier in the first instance, the assured, who has abandoned the possession and the property, cannot make himself a party, and dispose of the interest to which another has succeeded. It is for the benefit of the assured himself that the assurer should succeed to an interest in completing the original contract of carrying, by which the assured continues still bound, notwithstanding his abandonment; for it is not in his power by abandoning, to release himself from this obligation to the owner of the goods. It is to him that the owner of the goods must recur on the not completing the carrying. The owner of the goods has no privity of contract with the assurer, and cannot call upon him for his goods nor his damages. It is therefore against the interest of all concerned that the assurer should not succeed to all interest in the freight *pro rata*, and otherwise.

This is the view of the case I have taken as between the assured and the assurer, where only the vehicle of carriage is insured. But where the owner of a ship insures carriage or freight also, not only inconvenience but inconsistencies arise from the principle carried into effect of the assured after abandonment being considered as intitled to the *pro rata of freight earned.* It is this only which he can pretend to abandon to the insurer on freight; for that which may be earned after abandonment goes to the insurer on the ship. It can be only as trustee for the insurer on freight, that the owner of the vessel claims the *pro rata.* What therefore does he get by his insurance on freight when he abandons the vessel? The truth is, that the insurance on vessel and

on freight at the same time, by the owner of the vessel, is in the nature of it, to a certain extent, *a double insurance.* An insurance of the *absolute* property in the ship, and *the qualified property*, or the use for a specific purpose. *He who insures the part, has already insured the whole.* Should he claim the *pro rata*, he has nothing to abandon. It will become necessary therefore, that in case of such double insurance of ship and freight, the insurer on freight be informed of the insurance on ship also; for in case of an abandonment of ship, the insurer will claim the freight to be earned after abandonment, and the owner of the ship will claim for himself, the freight earned before abandonment. All that he can get in case of technical loss, is the premium paid to him, to be deducted out of the whole freight which he has insured and must pay. The owner of the ship claims the *pro rata for himself*, and not *as trustee* for the insurer on freight. This reasoning goes only to the inconvenience of considering *the owner of the ship* as intitled to the *pro rata*, and not *the insurer on ship*. For not being to have the *pro rata*, having insured the ship, he will not insure the freight without informing that he has insured on ship; and so in case of loss can have nothing to abandon to the insurer on freight, meaning to take the *pro rata* for himself. It goes to shew what must be the understanding also in cases of insurance, since we have nothing of a stipulation for the *pro rata* on freight. It must be considered as going, on abandonment, to *the insurer on the vessel.*

It may not necessarily follow that these deductions must be considered to be the understanding of the parties; but from the language of writers, the insurer on ship would seem to me to be considered *as a purchaser from the time of the insurance.* It is the value of the ship before the voyage that is insured, and not the value at the end of it, or at any intermediate stage. The insurer is considered *as a purchaser conditionally* from the time of the valuation. If she was to be considered as valued as at the time of abandonment, it would be reasonable that the freight she may have earned afterwards, should go with her in lieu of the wear and tear she may have suffered, and which would bring it to the same

thing as a valuation as at the time of insurance. *Emerigon* 196. 222-3-4.

With regard to the second point in this case, whether a *pro rata* has been earned, I would take it from the nature of the contract to carry to a certain place, that, in order to recover *a proportion*, a part only being performed, *the completing the contract must be dispensed with* expressly or impliedly by him *who has an interest in the completing it.* In case of injury to the vessel, it does not lie upon the owner of the cargo to *demand,* but on the owner of the ship *to offer* to repair or procure another. This is not expressly stated that I find in any of the books; for the language is equivocal, one while speaking of the owner of the goods *demanding,* another while of the owner of the ship or his representative the master *offering,* to repair or procure; but I deduce it from the nature of an *undertaking to do a thing,* that it must be done *or offered to be done* to intitle to a compensation. It must be the act of him for whom the thing is undertaken to be done, *to dispense with the doing it* in whole or in part; and by word or act, the duty must be waived by him *who has a right to insist upon it.* He who has undertaken to do a thing in one way, and cannot in that way do it, *must offer to do it in another.*

In the case before us, the supercargo must be considered as representing the owner of the cargo. But it is impossible to say that by accepting the proceeds of the sales, he dispensed with the obligation to complete the voyage; but rather that he accepted as in part of the damages sustained if any, for not completing, and as trustee in this case for the insurer on the cargo. Whether he ought to pay for freight under these circumstances, would seem to depend on his having derived benefit from the carrying so far. It may have been better for him to have had his goods in the port from whence they were carried; or the market may have been not less profitable than that to which bound. This is a fact that a jury would seem alone competent to settle, there being nothing that can with certainty be inferred *as to an offer on one side, or waiver on the other.* If the merchant has been profited, the shipowner ought to be allowed something reasonable. If he has received a benefit the law might presume

1811.

ARMROYD
v.
UNION
INS. COMPANY

that he has undertaken to compensate. Whatever this might be, I think the insurer on the ship will be intitled to receive. At least I would lay down this principle supposing it a new case. In the *English* books it would not seem to be decided in point; but so far as I can collect, when it comes to be decided, it will be this way. In the *New York* state, the point came expressly to be decided, 1 *Johnson's Cases* 377., where the court were divided, *Radcliff* in my opinion wholly wrong, *Lansing* and *Lewis* half right, *Kent* and *Benson right.* But in the court of errors and appeals what I think right, was thought wrong. It is settled in that state, that as between the assurer and assured this last is intitled to the *pro rata.* My judgment is the reverse, and *that the insurer is intitled;* and this from the *mutual interest and convenience of the parties concerned,* which is always a *test of principle,* and must govern, where a rule would not seem to have been settled expressly to the contrary; and which, from my investigation, would not seem to be the case here.