## CALLENDER and another *against* The Insurance Company of North America.

THIS was an action upon a policy of insurance, underwritten by the defendants on the 12th of *May* 1809, upon the brig *Mary* and her freight, at and from *Philadelphia* to *St. Bartholomews*, 4500 dollars on vessel, valued at that sum, and 1500 dollars on freight, valued at that sum.

The cause was tried before *Yeates* J. at a *Nisi Prius* in *December* last, when the following facts were in evidence.

The *Mary* sailed from *Philadelphia* upon the voyage insured, on the 30th of *April* 1809, with a cargo consisting principally of corn meal and flour, consigned to the master, who was instructed to proceed with it to *St. Barts*, and there to purchase with the proceeds a cargo of such sugar and coffee as might be lawfully imported into the *United States*, or bills, if a cargo could not be obtained. In the prosecution of the voyage, the vessel encountered severe gales of wind which did her great injury, and finally compelled her to bear away for *Kingston* in *Jamaica*, where she arrived on the second of *June*. A survey was immediately held, and the surveyors reported, that the repairs necessary to make her seaworthy, would cost more than she would be worth when repaired. The master directed inquiries to be made for a vessel to carry on the cargo to *St. Barts;* but none could be found, except a small Swede, that was unable to carry more than half the *Mary's* cargo, and the freight demanded for her was so exorbitant, that he was induced to decline chartering her. In consequence of these events, the brig was condemned, and together with the cargo, sold for the benefit of all concerned, sometime before the 19th of *June*, and the proceeds paid to the master. The cargo brought less than the prime cost. The plaintiffs abandoned to the defendants on the 20th of *July* 1809, as soon as they received advice of the loss, and on the same day they also abandoned to the *United States* Insurance Company, who were underwriters on the cargo.

1813.

Philadelphia,
Monday,
July 12.

Ship and freight were insured at and from Philadelphia to St. Barts. On her voyage the vessel was so much injured by storms, as to be under the necessity of putting into Jamaica; and upon being surveyed, it was found that her repairs would cost more than she would be worth when repaired. The master, who was consignee of the cargo, made inquiry for another vessel to carry it on to St. Barts; but the only one that could be procured, was not large enough to take more than half the cargo, and for her an exorbitant freight was demanded. In consequence of this the vessel was broken up, and together with the cargo sold for the benefit of all concerned. Upon receiving advice of the facts, the owners abandoned to the underwriters on ship and freight, and also to the underwriters on cargo. Held, that as the goods were not voluntarily accepted by the owners at the intermediate port, no freight pro rata was due, and therefore the assured were entitled to recover a total loss on both policies.

1813.

CALLENDER
v.
INS. COMPANY
of
N. AMERICA.

The only question made at the trial, was as to the sea-worthiness of the vessel; but to meet the point that now came into discussion, the following agreement was entered into by the parties:

" It is agreed, that if a verdict be given for the plaintiffs in this case, it shall be for the whole amount claimed on vessel and freight, with liberty to the defendants to move for a new trial; and if, upon such motion, the Court shall be of opinion that the defendants are entitled to a *pro rata freight*, the amount of such *pro rata* freight shall be tried and determined in a suit brought by the same plaintiffs against *Israel Pleasants*, President of the *United States* Insurance Company; and the said defendants shall be entitled to retain the amount of the freight insured, say 1500 dollars, until the said question shall be determined, and shall be bound to pay such proportion thereof to the plaintiffs, if any, as shall be over and above the amount allowed by the jury for the *pro rata* freight."

The jury having found for the plaintiffs, the defendants' counsel moved for a new trial.

*Hopkinson* and *Levy* for the defendants. A *pro rata* freight is due, upon principles of equity, and of the marine law.

It is contrary to natural justice, which is the foundation of equity, that labour should be performed without compensation; and it is manifest in this case, that an expenditure of money and labour has been incurred in the transportation of the goods, almost, if not quite, equal to that which the voyage to *St. Bartholomews* could have required. Nothing more than this can be necessary to lay a foundation for a recompense to the carrier. But there is also a service performed, which completes the obligation of the shipper to pay; for it is unquestionably a service to deposit the goods at a port nearer to their destination than they were at the port of departure; though what was the extent of it here, it is unnecessary to say. The inquiry at present, is not who is to pay freight, nor to what amount, but whether any freight was earned; if it was, the defendants are by the agreement entitled to the benefit of it. The contract, it is true, is not performed, except by the delivery at *St. Barts;* and upon the footing of that contract nothing can be claimed. But there are even by the common law, implied exceptions to all posi-

1813.

CALLENDER
v.
INS. COMPANY
of
N. AMERICA.

tive contracts, and it is peculiarly the province of equity to sustain them. 1 *Rep.* 92., 1 *Dall.* 212., *Bull.* 109., 1 *Eq. Abr.* 379. *pl.* 7. Where a party is prevented by inevitable accident from completing his contract, where he is guilty neither of fraud nor of negligence, and where in the part performance he labours or expends money for the benefit of the person who employs him, the original contract, particularly a commercial contract, cannot, upon principles of equity, stand in the way of a remuneration *pro tanto*.

The marine law has accordingly proceeded upon this basis; and from the earliest day at which we have any records of it, has asserted the rule, that where, without any fault of the master, the vessel is driven into an intermediate port, and is there forced to break up her voyage, freight *pro rata* is due. By the laws of *Oleron*, if a ship be disabled, and the merchants require their goods, the master " may, *if* " *he pleases*, deliver them, they paying freight for the part of " the voyage that is performed," *Art.* 27. 32. 42, which shews that they cannot have them without paying. By the laws of *Wisbuy*, " if the accident did not happen by any " fault of the master, then the freight *shall* be paid him." *Art.* 37. *Roccus* says, " When goods have been 'conveyed " a part of the voyage, equity directs that freight be paid " for that part of the voyage on which the goods have been " conveyed, and to that extent payment *must* be made." *Note* 81, *de navibus*, for which he cites *John de Hevia* and *Straccha*. By the Ordinance of 1681, " if the master cannot " find a ship to carry to the place agreed on, the goods pre- " served, he shall *only* be paid his freight in proportion to " what he has performed of the voyage." And by the late *French Code de Commerce*, " if the master has not been able " to hire another vessel, the freight is *only* due in proportion " to the voyage performed." *Art.* 296. This is one and the same principle speaking in all the most celebrated codes of marine law, and applies with great strength to the present case, which is precisely that referred to in the two last mentioned codes.

*Great Britain* has adopted the rule. In *Lutwyche* v. *Grey*, as stated by Lord *Mansfield* in *Luke* v. *Lyde* (a), a *pro rata*

(a) 2 *Burr.* 885.

1813.

CALLENDER

v.

INS. COMPANY
of
N. AMERICA.

freight was decreed, though the master *declined* carrying the goods from *Youghall* to *Glasgow*, the port of destination. In *Luke* v. *Lyde*, Lord *Mansfield*, who investigated the subject profoundly, sums up all the authorities by saying, " there can be no doubt but that *some* freight was due, for " the goods were not *abandoned* by the freighter," to the master, of whom he was then speaking. " If he abandons " all, he is excused freight," and not otherwise. In *Baillie* v. *Modigliani* (a), which was the case of a capture and sale of the goods at an intermediate port, the same judge pronounced the opinion of the whole court, that " as between " the owners of the ship and cargo, in case of total loss, no " freight is due; but as between them no loss is total where " part of the property is saved, and the owner takes it to his " own use. In this case, the value of the goods was restored " in money, which is the same as the goods, and therefore " freight was *certainly* due *pro rata itineris*." In *Mulloy* v. *Backer* (b), the reason of the rule is stated by Lord *Ellenborough* to be, if not the service rendered to the owner, the *labour* performed by the master in his service; and in none of the late *English* decisions is *Luke* v. *Lyde*, the leading case in this branch of the law, in the least shaken.

Our sister state, *New York*, has adopted the rule. *Williams* v. *Smith* (c), *Robinson* v. *The Marine Insurance Company* (d).

Our own state has adopted it in *Germain* v. *Maureau* (e), and in *Morgan* v. *Insurance Company of North America* (f). In the late case of *Armroyd* v. *The Union Insurance Company* (g), the judges did not unite in opinion.

The distinction by which in modern times the rule has been assailed, is that the acceptance of the goods must be voluntary, that the owner must elect to take them. There is nothing of this in the marine law. The contrary is manifest throughout. What is the meaning of the terms? If the owner takes his goods at all, he takes them in one sense voluntarily, he elects to take them. If you mount higher, to the disaster which has happened, then, that being involuntary, all its consequences are so. There cannot then be a voluntary acceptance, if reference is had to the loss; and there cannot be an involuntary acceptance, if reference is had to the taking

(a) *Park* 70.                (d) 2 *Johns*. 323.           (g) 3 *Binn*. 437.
(b) 5 *East* 322.            (e) *Ingersoll's Roccus* 70.
(c) 2 *Caines* 21.          (f) 4 *Dall*. 454.

merely. It is in truth a distinction without meaning; and is in no manner connected with, or founded upon the true principle of the right to recover, namely, the labour of the master, and his inability to do more than he has done.

*Binney* and *Chauncey* for the plaintiffs. The claim to *pro rata* freight, is placed by the defendants upon ground on which it cannot be maintained; it has no defence in the principles either of the common or marine law, and it is in opposition to both. If service performed is at the foundation of the claim, how can it be supported in a case in which the goods brought less at the intermediate port, than their cost, and where the disaster absolutely defeated the adventure, a material object of which was a return cargo, that could not legally be imported from *Jamaica?* Such a principle was not thought of in *Luke* v. *Lyde*, where it was agreed that the freight was greater from *Biddeford* to *Lisbon*, than from *Newfoundland.* If labour performed is the principle, why is it that in the case of capture, or of total loss, though in the very port of destination, no freight is due? The labourer is no doubt worthy of his hire, but he is worthy according to his contract only. Labour *per se* is nothing; it must be connected with something else, to constitute a right of action. The only question then is, what must be connected with the labour performed; and that is, a voluntary acceptance of the goods at the intermediate port, from which the law will imply a new promise to pay, in consideration of the labour.

This question is not to be decided by the common law merely. Where an express contract is entire, that law does not raise a promise by implication in the case of a part performance. Nor is it to be decided by the ordinances of ancient or modern *France.* They are more in the nature of statutes, than declarations of the marine law. It is to be settled only by the marine law, as it has been interpreted and applied by those from whom we derive our laws, and by our own Courts; and the principle to be obtained from this source is, that where a ship and cargo are driven into an intermediate port, and the owner, having an election to send on the goods in the same or another ship, agrees to take them at the intermediate port, with the consent of the master, freight *pro rata* is due.

The rule is obviously a reasonable one. The contract in

*1813.*

CALLENDER
*v.*
INS. COMPANY
of
N. AMERICA.

its origin is entire, and calls for entire performance. If wholly performed, the whole compensation is earned. If part is performed, and the remainder, though practicable, is dispensed with by both parties, one giving up the right to entire performance, and the other to entire freight, the marine law gives rise to a contract to pay *pro rata.* If the remainder cannot be performed at all, then the disaster which excuses the master from going on, excuses the owner from paying. This is plain justice between the parties. The consequence of the defendant's rule on the other hand is, that however useless or pernicious the landing at an intermediate port may be, though the goods are carried to a market where they are of less value than their cost, and from which they can never be taken away, still the owner must lose his goods entirely, or pay a *pro rata* freight. There is no equity in such a rule as this; it gives the master either the goods or a *pro rata* freight in every case without exception.

The meaning of a voluntary acceptance then is plain; and the necessity of it, according to ancient codes, as well as modern decisions, is equally so. The laws of *Oleron* evidently refer to such a case; for, after saying that if the merchant requires his goods, he must pay freight, they proceed to say, " but if the master can readily repair his ship, he " may do it, or if he pleases he may freight another ship to " perform the voyage." *Art.* 4. The case spoken of, is one in which the ship may be repaired, or another procured, and therefore the acceptance must be voluntary. *Molloy* and *Maline* say, " if the freighter disagrees to the master's carrying " the goods in another ship, the master shall receive his " freight in proportion." *Maline's Lex Mer.* 98., *Molloy, lib.* 5. *c.* 4. *s.* 4. The laws of *Wisbuy* speak of the same case. *Art.* 16. No one of these codes gives a *pro rata* freight, when the goods must necessarily remain at the intermediate port.

*Lutwyche* v. *Grey*, the earliest *English* case, is erroneously stated by Lord *Mansfield.* From a report of it by *Abbot*, *Treat. on Ship.* 196, the *pro rata* was given, because the owners refused to let the master carry on the goods in another ship, and took them away. A voluntary acceptance was evidently the ground of the Court in *Luke* v. *Lyde.* The facts shew it, because the owner sent the fish to *Bilboa*, and of course they could have been sent by the master to *Lisbon.* Lord *Mansfield* relies upon it. He says " the mer-

"chant did not abandon, but took the goods, and did not "require the master to carry them to *Lisbon*, the port of de- "livery." In all subsequent cases, *Luke* v. *Lyde* has been confined to its particular facts. Lord *Mansfield's* reasoning, and his endeavours to import into the law of *England* the *French* ordinance, have never received the sanction of later judges. What is said in *Baillie* v. *Modigliani* is a dictum; the right to *pro rata* freight was not in discussion, but the obligation of the insurer on goods to pay it. In other cases, if the acceptance has not been voluntary, freight has been refused; and *Luke* v. *Lyde* has been defended solely upon that distinction. *Mulloy* v. *Backer* (a), *The Hiram* (b), *Liddard* v. *Lopez* (c). So it has been in *New York; Post* v. *Robertson* (d), *Marine Insurance Company* v. *United Insurance Company* (e); in the Circuit Court of the *United States, Hurtin* v. *Union Insurance Company* (f); and in this Court in *Armroyd* v. *Union Insurance Company* (g); for although in the last case, the Judges did not unite, Judge *Yeates*, who was in favour of a *pro rata* freight, seems to have considered the claim made by the owners to the profits on the bills purchased with the proceeds of sale, as equivalent to voluntary acceptance, the necessity of which he does not deny.

In this case then, there is no *pro rata* freight, because the goods were not accepted voluntarily, but were necessarily sold at *Kingston*, from which no vessel could be obtained to carry them on; because as soon as the disaster was known to the plaintiffs they abandoned; and because the underwriters on goods never took any step in relation to them, from the loss up to this time. If freight must be paid, the plaintiffs must lose it, although all their interests were insured; for it seems admitted that the underwriters on goods have nothing to do with the freight.

TILGHMAN C. J. If this case were to be considered on principles of natural justice, there seems no reason why any freight should be paid; because it does not appear that any service was performed. The voyage was planned for *St. Barts*, at that time a neutral island, from whence a cargo might have been imported into the *United States;* but that

---

(a) 5 *East* 317.  (d) 1 *Johns.* 24.  (g) 3 *Binn.* 437.
(b) 3 *Rob.* 183.  (e) 9 *Johns.* 186.
(c) 10 *East* 526.  (f) 1 *Condy's March.* 281.

**1818.**

**CALLENDER**
**v.**
**INS. COMPANY**
**of**
**N. AMERICA.**

could not be done from *Jamaica*, because the non-inter-course law was in force, which prevented all communication between the *United States* and a *British* island. Neither ought any freight to be paid, if we look to the terms of the contract, because the stipulated voyage was not performed. But it is said, that freight *pro rata* should be paid, because such is the precept of the marine law, which has been adopted as part of the common law. The ancient codes of marine law do not seem to be quite clear on this point. In *Wellwood's Abridgment of all Sea Laws*, published in the year 1636, and said to be collected from all writings and monuments then existing, I find it laid down in *page* 75, as follows: " If the ship in her voyage become unable, without " the master's fault; the master may either mend his ship or " freight another; but in case the merchant agree not thereto, " then the master shall at least obtain his freight so far as he " hath deserved it." For this the author cites the *Laws of Oleron*, and the *Rhodian Laws*, said by Lord *Mansfield* to be the most ancient in the world. Supposing this to be the law, it does not follow that any freight is earned in case the master will neither repair his ship, nor freight another. I know there are not wanting some ancient authorities in support of *pro rata* freight, when the ship becomes unable to perform the voyage without any fault of the master, although he does not offer to freight another vessel; but upon the whole I do not consider the point, so far as it rests upon ancient marine authority, as by any means clearly settled. The more material question, however, is what has been the principle recognised by the *common law*. The case principally relied on in support of freight, is *Luke* v. *Lyde*, 2 *Burr.* 883. There can be no doubt, but that case was rightly decided, because, according to Lord *Mansfield's* statement of it, the merchant did not require the master to carry the goods to *Lisbon*, the port of delivery, but received them and carried them himself to another port. Under such circumstances, by fair implication, a new contract arose to pay freight *pro rata*, and on no other principle is that decision supported. But although the point decided in *Luke* v. *Lyde*, has never been denied by Lord *Mansfield's* successors, yet it has been said by Lord *Ellenborough* in *Liddard* v. *Lopez*, that it has been *pressed beyond its fair bearing*; and where such pressure has been to the extent contended for in the

argument of the case before us,—to an extent which entitles the master to *pro rata* freight, although the merchant requires him to procure another vessel, and complete the voyage, and he refuses to do so,—I think I may venture to assert that the doctrine has never been received with approbation. On the contrary, it seems to have been understood, that *pro rata* freight is not due, unless the consent of the merchant, either by words or actions, has been expressly given, or may be fairly deduced, to accept his goods at an intermediate port; and such consent being given, the original contract is dissolved, and a new one arises. For this principle, I refer to the cases of *Cooke* v. *Jennings,* 7 *T. Rep.* 385., *Liddard* v. *Lopez,* 10 *East* 526., *Hurtin* v. *Union Insurance Company,* in the Circuit Court of the *United States, Pennsylvania* District, 1 *Condy's Marsh.* 281. *a. (notis); The Marine Insurance Company of New York* v. *The United Insurance Company,* decided by the Supreme Court of *New York,* 9 *Johns.* 186., and *Armroyd* v. *The Union Insurance Company,* in this Court, 3 *Binn.* 437. The question then will be, whether there was any consent to receive the goods at *Jamaica,* in this case. I cannot see that there was. The vessel was unladen from necessity; and the master finding that the difficulty and expense of freighting another, were greater than he chose to encounter, the cargo was sold for the benefit of whom it might concern. The owner of the goods abandoned; and as for the underwriters, they knew nothing of what had been done, till long after the business had been concluded. I am of opinion upon the whole, that inasmuch as the original contract was not performed, nor any consent given to substitute a new one in the place of it, the claim of *pro rata* freight cannot be supported.

YEATES J. The general principle as to freight is, that it is demandable where the goods are delivered at the port of destination according to the terms of the bills of lading; for such is the contract between the parties. Indeed where some event has arisen, which has frustrated the voyage after it has begun, and the vessel has become innavigable, and the ship owner offers to transport the goods to the destined port, which the owner of the goods, or his agent, refuses, there full freight also is due. By the maritime law, where the owner of the goods or his agent *voluntarily agrees* to accept

1813.

CALLENDER
*v.*
INS. COMPANY
of
N. AMERICA.

them at an intermediate port, he becomes liable to pay freight *pro rata itineris*, though there be no express stipulation for that purpose. In *Armroyd* v. *Union Insurance Company*, I differed in opinion from the majority of the Court, and thought that such circumstances existed in that case, as were equivalent to a voluntary receipt of the goods. The super-cargo accepted the remnant of the cargo at *Antigua*, sold it to a good profit, and invested the amount of sales in bills of exchange, on which a considerable profit arose to the concerned, which were accounted for to the company, allowing a small commission for the negotiation. I apprehended that the case was brought within the principle of former decisions, and according to the expressions of Lord *Mansfield*, in *Baillie* v. *Modigliani*, *Park* 53. *5th ed.* the value of the goods being restored in money, was the same as the goods themselves, and therefore freight was due *pro rata itineris*. Be this as it may, there is no acceptance of the goods in this case at the intermediate port, nor any substitution of money for them, nor any other circumstance upon which, in my idea, the law would imply a promise to pay a rateable freight. I am therefore of opinion, that judgment be rendered on the verdict, without any abatement for such freight.

BRACKENRIDGE J. concurred with the Chief Justice.

Judgment for the plaintiffs.

