NEW-YORK,
May, 1806.

N. L. & G. Griswold *against* The New-York Insurance Company.

THIS was an action on a policy of insurance dated the 27th *February*, 1804, on the *freight* of the ship *Culloden*, valued at $3,200, on a voyage " at and from *New-York* to *Barcelona* with liberty to touch at *Gibraltar*." . The loss was stated in the declaration in the following manner : that the said ship, while endeavouring to sail out of the harbour of *New-York*, in the prosecution of her voyage, " was assailed by tempests, and by the mere violence of " the winds, waves and current, was driven aground and " stranded on the beach or shore of *Long-Island*, at or " near *Brooklyn*, and was then and there forced, driven " and cast upon and against certain sands, sand-banks and " rocks, and the said vessel thereby became and was " stranded, bilged, broken, shipwrecked and filled with " water, and the goods and merchandize laden on board " the same, became and were wet, spoiled and damaged, " and were rendered wholly unfit to be transported to their " intended destination, insomuch as to render it expedient " and necessary forthwith to sell and dispose of the same " at public auction, &c.——By means whereof the said voy- " age was interrupted, broken up and lost, and the freight " so expected to be earned by the said vessel and assured, " became and was wholly lost to the owners thereof."—— The cargo consisted of flour and staves. The vessel in attempting to get out of the harbour, on *Saturday* the third of *March*, 1804, about three o'clock in the afternoon, grounded, at *Brooklyn*, on the shore opposite the city of *New-York*. Having twisted her sternposts, she became

A vessel in attempting to get out of the harbour, in order to proceed on her voyage, grounded, in consequence of which she became leaky ; the cargo, consisting chiefly of flour, being damaged, was unladen. The ship was repaired in six days, at an expense of $150. Information of the accident was given to the underwriters on the *ship and freight* the day after it happened, and a formal abandonment made to them two days thereafter. The owners of the cargo received it of the owners of the vessel, and sold it at auction at a loss of about 27 per cent. It was held that the insured had no right to abandon ; but ought to have insisted on carrying the cargo to the place of its destination so as to entitle them to their full freight. The assistance given by the insurers in saving the property, on being informed of the accident, did not amount to an acceptance of the abandonment. The law for the inspection of flour intended for exportation, does not require that flour once inspected and shipped, and afterwards damaged by sea-water, should be again inspected, before it is exported.

NEW-YORK,
May, 1806.

N. L. & G.
Griswold
v.
New-York In-
surance Com-
pany.

extremely leaky ; she was got off and hauled to a wharf at *Brooklyn*, where it became necessary to take out the cargo to prevent her sinking. All the flour, except about 150 barrels, was damaged. The ship on the 5th *March* was got over to *New-York*, and repaired in six days at an expense of about 150 dollars, and was in possession of the assured ready for sea. The flour was sold for about half its cost, and for more than double the amount of freight.— The plaintiffs, on the 4th *March*, informed the defendants of the accident which had happened, requesting them to take such measures for the preservation of the vessel and freight as they might think proper. On the 5th, they made an abandonment of the freight to the defendants, on the ground that the voyage was broken up ; and again on the 7th, they made a formal abandonment of their interest in the ship and freight to the defendants, and offered them all the documents and information in their power. No answers were returned by the defendants to these communications. The defendants were also insurers on the ship. The cargo, which was insured by the *Commercial Insurance* Company, belonged to persons to whom the plaintiffs had chartered the ship for the voyage : the owners on hearing of the accident, abandoned the cargo to the insurers, who accepted the abandonment.

One of the directors of the *New-York Insurance Company*, and their agent on such occasions, and another person, an agent of the *Commercial Insurance Company*, assisted and gave directions in saving the cargo. The plaintiffs also assisted in the preservation of the vessel and cargo.

The cargo was taken away and sold by the *Commercial Insurance Company*, and, as it appeared, with the assent of the plaintiffs. The loss on the net sales of the cargo was about 27 per cent.

The charter-party between the plaintiffs and the owners of the cargo, contained the usual covenants, and that the same should be delivered, &c. " the acts of God, fire, and

all and every the dangers and accidents of the seas, and of navigation of whatever nature and kind soever, restraints of foreign powers and all other casualties during the voyage, always excepted."

The cause was tried at the *New-York sittings*, on the 16th day of *January*, 1805, before Mr. Justice *Livingston*, when the jury found a verdict for the plaintiffs for a total loss.

The grounds on which the defendants now moved to set aside the verdict were, 1. That the declaration did not contain a sufficient averment of the loss. 2. That the plaintiffs had no right to abandon the ship or freight. 3. That the abandonment was not accepted. 4. That the verdict was against law and evidence.

*Hoffman* for defendants. The averment of a total loss of freight, contained in the declaration, is insufficient. Because the cargo was damaged, it did not follow that the plaintiffs would not be entitled to freight. The damage to the ship was very slight ; she was repaired in a few days, at a small expense, and was in a situation to prosecute her voyage, and earn freight. It was in the power of the plaintiffs, as owners of the vessel, to have retained the cargo as security for the freight, if the owners of the flour did not choose to send it forward to its place of destination, in its damaged state. The flour having been once regularly inspected and shipped, and the voyage commenced, there was no necessity for its being re-inspected for exportation, since it must be considered as already exported. The continuation of the voyage would have been no infraction of the law for the inspection of flour and meal.* It would be very hard, therefore, to make the defendants answerable for a total loss ; especially, as without an abandonment of the ship to them, they could have no right to the *lien* on the cargo for the freight. There is no pretence that any abandonment of the ship was made before the 7th *March*, or that it was accepted. Prior to that time the owners of the vessel had delivered the greater part of the cargo. Admitting that

* Rev. Laws of N. Y. vol. 1. 426. §7 & 8.

NEW-YORK,
May, 1806.

N. L. & G.
Griswold
v.
New-York In-
surance Com-
pany.

enough remained to pay the freight, yet the defendants, by virtue of an abandonment, would be entitled to a lien on the whole cargo, which has thus been impaired by the act of the plaintiffs.

Nothing can fairly be inferred against the defendants from the conduct of the agent of the defendants, who is usually employed in cases of wreck or stranding. It was es- sential to the preservation of the ship, that the cargo should be landed. He assisted as a matter of duty, and it does not appear that he gave any directions as to the disposition of the cargo.   His acts, therefore, cannot be construed into a consent on the part of the defendants, that the voyage should be broken up.   The principal is not answerable for the acts of a special agent, farther than while the latter acts within the scope of his authority.†   Besides, the cargo was unladen, and sent to auction, before the aban- donment was in fact made.

† *Espinasse's*
Rep. at N. P.
vol. 1. p. 111.
*East-India Co.*
*v. Hensley.*

., The judge at the trial left it to the jury whether the de- fendants had not accepted the abandonment, when there was no evidence whatever of that fact.   The jury then must have found their verdict without any evidence to support it.

T. L. *Ogden* and *Riggs* for the plaintiffs.   The declara- tion avers the breaking up of the voyage in consequence of the damage to the cargo, which is a total loss, from the interruption of the voyage.   Freight is dependent on both vessel and cargo, and if the voyage be defeated by means of the cargo, it constitutes a total loss within the meaning of the policy.   Though the flour was not, at first, so much damaged as to be totally lost, yet it was so far injured, that it must inevitably have spoiled before it reached its port of destination.   It was the duty of the insured, and for the   interest of all parties, that the voyage should be broken up, that as much as possible of the cargo, should be saved.   The ship-owners undertook to deliver the cargo, saving the perils of the sea.   The perils of the sea, have in this case prevented the delivery.   It is a just and sound principle in the *French* law, though it does not appear to

have been adopted by any *English* decision, that the charter-party is dissolved by shipwreck. So in cases of embargo, where the goods are of a perishable nature, the contract is considered as at an end.* It would be a very rigid rule to compel the party to carry the goods to their place of destination, when it is certain that they must perish and be wholly lost, by the way. Every party is bound to a beneficial performance of his contract; but if an event intervenes which prevents the performance, or renders it injurious, he shall be excused. As in the case where A underlet a house with the furniture to B, the latter was excused from paying or performing his part of the contract, because the furniture was subject to arrears of rent.† In consequence of the damage to the cargo, the contract of charter-party could not have been performed without injury to the plaintiffs; for if they had carried it in its perishable state to the place of destination, they would have had no security for the freight; if it be law, as Lord *Mansfield* observed, in the case of *Luke v. Lyde*,§ that the owner of the goods may abandon them for the freight. The acts of the agent of the defendants, strongly evince, that the abandonment was accepted; and though he made no express declaration that he was acting for the defendants, yet this is the fair and just inference from his conduct. The flour that was unladen before the abandonment was made, was an act of necessity, to prevent the ship from sinking. The plaintiffs were not bound to remain idle spectators and suffer the property to perish. By the abandonment the insurers became the owners of the flour, and it was their duty to have it re-inspected if necessary. The 6th section of the act, authorises the re-inspection of flour before inspected. But the true construction of the act is, that it prohibits the sending of damaged flour out of the state. The policy of the law is to preserve the reputation of the state, as to this article, in a foreign market. It should, therefore, be good, at the moment preceding its exportation. The plaintiffs were thus excused for not sending it to its place of destination. The objection that the *lien* of the owners of the vessel was im-

NEW-YORK, May, 1806.

N. L. & G. Griswold v. New-York Insurance Company.

* *Abbott*, 343.

† *3d Bos. & Puller*, 172. *Partridge v. Sowerby*.

§ *2 Burrows*, 886.

NEW-YORK,
May, 1806.

N. L. & G.
Griswold
v.
New-York In-
surance Com-
pany.

paired by the landing and delivery of a part of the cargo, begs the question. The owners of the cargo were not bound to put it on board of the ship after she was repaired, in order that she might earn freight. If so, the ship-owners were entitled to *pro rata* freight only. The notice given on the 4th of *March*, to the insurers to take care of their interests, enabled them to secure an indemnity for the freight, as effectually as if the ship had been transferred. If there was property on board sufficient to answer all demands, it was enough. To entitle the defendants to receive the freight, it was not necessary to abandon the ship. As long as the law allows the ship and freight to be insured separately, the right to abandon the freight, whenever the voyage is broken up and defeated, must exist, and be supported throughout, distinct from, and independent of the ship.

*Harison* in reply. In six days after the accident, the ship was completely repaired for a trifling expense, and capable of proceeding on her voyage. Can it be said that the assured had a right to abandon in such a case? If the right existed, it did not arise from the condition of the vessel; but from that of the cargo. But the state of the cargo will never authorise an abandonment of *freight*, while there are goods enough remaining to pay the freight. If the owner of the vessel has thought proper to give up the cargo, when he might have prosecuted the voyage and been entitled to full freight, it is his own act, for the consequence of which the defendants ought not to be made liable. The language of the contract is, if the freight be lost by the perils of the sea, the insurers will pay the amount, otherwise not. If the assured has delivered the cargo without receiving the freight, it is his own folly. The notice of the accident said to be first given, though not stated in the case, may be considered as a very proper act, even though the plaintiffs had not any intention to abandon. The language and conduct of the agent of the defendants, shewed merely his co-operation with the plaintiffs, in saving the cargo, that it might be carried to its place of destination; what he did, on the occasion, was proper,

NEW-YORK,
May, 1806.

N. L. & G.
Griswold
v.
New-York In-
surance Com-
pany.

with a view to the probable average loss that might arise. His conduct as to the unlading and saving the cargo, does not imply that he acted for the insurers, as owners; it was merely to diminish the loss that might arise from the accident. The abandonment was made on the 7th, when a part only of the cargo remained for them to take possession of, in order to secure the freight. If the plaintiffs before acted as the agents of the defendants, they violated their duty in disposing of the cargo; by delivering the best part of the flour and leaving only what was damaged, they impaired the security of the insurers for the freight. In the state in which the cargo was at the time, it could not be abandoned, for it was not deteriorated to half its value; and its future or possible state is not to be anticipated as the ground of an abandonment. It is impossible to decide whether the sending of the goods forward in such a case, may not prove beneficial. If the vessel had been driven into an intermediate port, and the cargo thus slightly damaged, the assured would have been bound to have prosecuted the voyage. It is probable, that the cargo, when carried to its destined port, would have paid the freight, or at least a portion of it. The assured ought not to be allowed to decline taking this chance, and to break up the voyage, on mere conjectures as to the probable result. That the performance of the contract would not have been beneficial, is not a legitimate excuse. There are many contracts which the party is bound strictly to perform, though it may be to his own prejudice; as in the case of a common carrier, or a covenant to pay rent, which must be executed though the premises be destroyed by fire.

The act relative to the inspection of flour furnishes no excuse. The flour in this case, had been actually inspected according to law. If the vessel had been detained several weeks in port, by contrary winds, would the inspectors have had a right to insist on re-inspecting the flour, because, in the intermediate time, it may have received damage on board? It is enough if the flour be in-

NEW-YORK, spected at the time it is laden; as soon as the vessel is
May, 1806. cleared out from the custom house, the authority of the
N. L. & G. inspectors is at an end. The 9th section of the act, ap-
Griswold plies merely to the inspection of the article at the time of
v. lading. The *intent* of the act is, no doubt, to maintain
New-York In-
surance Com- the credit of this staple. But its reputation cannot be
pany. affected by a deterioration arising from *sea-damage*, if not
vitiated by any original or internal defect, for foreign
nations will not impute the effects of sea-damage, to any
original bad quality in the flour.

KENT, C. J. I am of opinion that the plaintiffs might
have carried on the flour without a re-inspection, and if
the owners had refused to permit them, they would have
been liable for the full freight for the voyage. The in-
spection law does not apply to the case of flour duly in-
spected and shipped, and relanded after the commence-
ment of the voyage, for a temporary purpose merely. It
might have been otherwise, if the voyage in question had
been given up, and the flour afterwards purchased for
another and distinct voyage. But as long as the voyage
continues, the first inspection will be sufficient.

The plaintiffs had also a right, on refitting their ship
in due season, to insist on taking on the cargo, or to be
paid their full freight. This rule received a clear and
full recognition, in the case of *Lutwidge & How* v. *Gray*,
determined in the house of Lords in 1733; *(Abbott,* 249*)*
and it was alluded to as being a settled rule, by the court of
K. B. in the case of *Luke & Lyde.* (2 *Burr.* 882.*)*
But we have a nearer authority, in the case of *Herbert* v.
*Hallett*, decided in this court in *April* Term, 1802. It was
an action on a policy on freight, on a voyage from *New-
York* to the *Havanna.* The voyage commenced, and the
brig was stranded at *Sandy-Hook.* The cargo was unla-
den in an injured state, and brought back to *New-York*,
and the vessel returned in three or four days, and in two
or three weeks was completely repaired. The court held
that the freight of the voyage was lost by the negligence

or folly of the plaintiff, and not by the perils of the sea; for that he might have taken on the cargo, but having neglected to entitle himself to freight against the shipper, he ought not to recover it of the insurer.

The only remaining inquiry in this case is, whether the defendants accepted, and thereby made valid, the abandonment of the freight. The abandonment of the ship was made to them on the 7th of *March*, when she was in safety, and then there was no colour of right to abandon, nor was there any proof of an acceptance. The defendants did not, therefore, become owners of the ship, so as to have made it incumbent on *them*, to have offered to carry on the cargo. Nor is there any act of theirs, which looks towards an acquiescence in the abandonment of the freight. Their agent superintended the unlading of the ship, and that act was requisite for the repair of the ship; this superintendance was prudent and proper, as they were responsible for the damages and repairs, and it would be unreasonable to construe this act, which evidently had for its object only the repair of the ship, into an acceptance and ownership of the freight.

I suppose it unnecessary to examine the question, whether the shipper would be liable for any freight, after having abandoned his cargo to the owner of the vessel, in consequence of its great deterioration, because, we have no reason to conclude from the case, that the flour would not have been of sufficient value at the port of destination, to have paid the freight. The verdict before us is clearly against evidence and law, and ought to be set aside with costs to abide the event.

Tompkins, J. Spencer, J. and Thompson, J. concurred.

Livingston, J. I concur in the opinion just delivered, but there is one point made in the cause that has not been noticed, and which it appears to me necessary to decide before the plaintiffs can have judgment.

NEW-YORK,
May, 1806.

N. L. & G.
Griswold
v.
New-York In-
surance Com-
pany.

To make out a right to abandon, it was insisted that the injury which happened to the cargo, would have rendered it of little or no value before it reached its port of destination, and that therefore the plaintiffs would have earned nothing by carrying it on, as the shipper might, in such case, have avoided payment of freight altogether, by an abandonment of the property.

That an owner of a vessel, after a literal performance of the terms of the charter-party, by carrying a cargo to its destined port, should be entitled to freight, whatever injury it may have sustained *in transitu*, so that it proceed from no fault on his part, appears a proposition so self-evident, that perhaps it never would have been questioned, but for what fell from Lord *Mansfield* in delivering judgment in the case of *Luke* v. *Lyde.* "If the "merchant," says his lordship, "abandons the whole car- "go, he is excused freight, and he may abandon *all*, "though they are not all lost." But, besides that a different point was then before the court, it is not certain, that Lord *Mansfield* intended to be understood, as speaking of an entire cargo, actually transported to its place of delivery. If he did, I can only say, that the opinions of the most learned judges, on points not at the time in issue, though entitled to respect, have not the force of authority, on those who follow them. This would be making the ship-owner, an insurer of goods to the amount of his freight, and exposing him to an entire loss of the latter, without any fault on his part. Where is the evidence of his having assumed the risk? In the contract we look for it in vain; still less will the conclusion result from any fair course of argument. When a good vessel has been provided; when she has been well found; when she has performed the voyage, and is ready to deliver her cargo, there is nothing more which the merchant has required as a condition precedent to the payment of freight. Upon what pretext, then, after having used the vessel agreeably to the contract, can he throw on the master's hands

a cargo which may not be worth a cent, instead of paying the sum agreed on for the carriage of his goods? What in such case is to become of the mariners? Are they too, to lose the wages of their labour, which would be a natural, but unreasonable, consequence of such a doctrine, for, generally speaking, if freight be not earned, no wages are due ; or are they also to come in for a dividend on a damaged and putrid cargo?—Surely, they may say with the poet, *hæc in fœdera non venimus.* If the injury arise from the misconduct of the owner, master, or mariners, or from unfitness, or want of sea-worthiness in the vessel, there is no hardship in depriving the owner of freight to the extent of the damage done, and rendering him liable for farther compensation, if necessary to make the merchant whole, and also for the seamen's wages. Of the same opinion is *Pothier**  in his treatise on charter-parties.

' New trial granted.

NEW-YORK, May, 1806.

* *Charte-Partie,* Part 1. Sec. 3, Art. 2. § 1.