## C. W. ADAMS & CO. v. A. C. HAUGHT AND OTHERS.

The contract for the conveyance of merchandize is, in its nature, an entire contract; and unless it be completely performed by the delivery of the goods at the place of destination, the carrier cannot, in general, claim freight. The cases in which a partial payment may be claimed are exceptions, founded upon principles of equity and justice, as applicable to particular circumstances.

If the owner of the cargo, either by his waiver or default, is the cause of its not being transported to the place of destination, full freight may be recovered.

If, in cases of disaster, the owner of the cargo will not allow the master time to repair, or to proceed or transport the goods in another vessel, the master will be entitled to the whole freight, because the owner is the cause of preventing the performance of the contract.

Where a vessel is, from inevitable necessity, detained at an intermediate port and unable to prosecute the voyage, and the goods are there voluntarily accepted by the owner, freight is to be paid according to the proportion of the voyage performed, and the law will imply a contract to that effect.

If there be another vessel in the same or a contiguous port, which can be had, the duty is clear and imperative, upon the master, to hire it; yet, he may refuse to hire another vessel, and insist on repairing his own; and whether the freighter be bound to wait for the time to repair, or becomes entitled to his goods without charge of freight, will depend on circumstances. What would be a reasonable time for the merchant to wait for repairs, cannot be defined, and must be governed by the facts applicable to the place and time and to the nature and condition of the cargo.

Where the master refuses to repair his ship and send on the goods, or to procure other means for the purpose, and the owner of the goods then receives them, this is not such an acceptance of the goods as will entitle the ship-owner to a *pro rata* freight.

See this case for circumstances under which the owners of a flatboat were held not only not entitled to recover full freight, but also not entitled to recover freight *pro rata itineris;* only part of the voyage having been performed.

Appeal from Dallas. Action by the appellees against appellants on a contract of affreightment. Verdict and judgment for the plaintiffs for $200. The facts were as follows:

The counsel for the parties failing to agree to a statement of facts, the following is given by the presiding Judge, as the facts proved on the trial: That defendants shipped by plaintiffs a quantity of cotton and hides, as specified in the following bills

of lading, and in the condition and for the price therein specified.

Shipped in good order and well conditioned, by C. W. Adams & Co., on board the boat called the Dallas, whereof A. C. Haught is master, now lying at the Dallas landing in Trinity river, and bound for Magnolia, (here follows a description of cotton,) and marked and numbered as per margin, which I agree to deliver in like good order and condition at the port of Galveston, (the obstructions to, and dangers of navigation and fire only excepted) unto C. W. Adams & Co., or to their assigns, he or they paying freight for the same, at the rate of one cent per pound on the weight of each bale of cotton. In witness whereof the master of said boat hath affirmed to three bills of lading, all of this tenor and date, one of which being accomplished, the others to stand void.

Dated at Dallas, Texas, March 8th, 1855. With privilege of re-shipping.  A. C. HAUGHT, Master.

That said freight was shipped in and upon said boat; that the river had not been before navigated from Dallas to Porter's Bluff; that defendants knew the character of the boat, and the condition of the river; that plaintiffs assured a witness that they could go down the river with their boat; that plaintiffs were about six weeks in going from Dallas to Porter's Bluff, and arrived there about the fifteenth of May; that the boat was well manned, and that the delay was caused by said boat encountering a number of rafts on the river; that plaintiffs had to unload said boat to pass one of the rafts, and rolled the cotton down to it, and on one occasion had to throw a few bales of the cotton into the river to get the boat off the logs; that when plaintiffs arrived at Porter's Bluff the river was between half bank and bank full; that they there unloaded said freight and stored a part of it in the only accessable house at that place, and the balance by the side of and under the eave of said house; that the river was then falling very fast; was down in a few days; that a few days after plaintiffs stored the freight as above, they discharged the boat's crew, and put said freight

in charge of Gabriel Thompson, and all left for home, in Dallas county. Some of the witnesses testified that the river was so obstructed by rafts as to be impassable by the boat of plaintiffs below Porter's Bluff. Others said that it might have been navigable with difficulty, and others said it was navigable. That plaintiffs attempted at the time they got to Porter's Bluff, to ship said cotton on the steamboat Nick Hill, from that point to Galveston, but could not agree with the owners of the Nick Hill as to the price of the freight, and therefore did not ship on her; that the Nick Hill come up the river and loaded at Porter's Bluff a day or two after the plaintiffs' boat got there, but got there with much difficulty, by the assistance of the citizens and the use of the capstan; that after the freight was stored as above, W. A. Gold, one of the defendants, and others, made a survey of the cotton and hides, and found them to be damaged about ten per cent.; some time after which said Gould gave to one Luke, a wagoner, an order for a load of said cotton, to be hauled to the city of Houston, and that Luke took the cotton accordingly; that the balance of the cotton remained there until about the first of October, and was damaged by being exposed, about fifty per cent.; that about that time one Neman and one Hopkins took possession of said cotton, acting for C. W. Adams & Co., of Galveston; and on account of its damaged condition, the bags and rope being so rotten that they broke off on attempting to move it, they took it to a cotton press and caused it to be re-packed and hauled by wagons to the city of Houston; that the river was up several times during the summer; that the Nick Hill did not leave the landing at Porter's Bluff until after the cotton was removed from there. Some of the witnesses testified that they could have gone out during the summer, and before the removal of the cotton. Some of the witnesses said the Nick Hill would have gone down if she had got freight, and others that her officers left her during the summer.

*J. M. Crockett*, for appellants. The verdict of the jury is contrary to law and the facts.

The provision in the bill of lading, excepting the perils of navigation, as is well known, is not to secure the payment of freight, but to protect the owners of the vessel from damages.

But these appellants take no exception to the voyage of the boat Dallas, so far as she proceeded. All the damage to the cargo and loss to the appellants resulted from the extraordinary and unwarrantable delay and exposure of the cargo at Taos, without an effort or apparent design on the part of the master or owners of the boat, to proceed farther or to send on the cargo.

The master of the Dallas should have gone down immediately after the Nick Hill came up, or have re-shipped on her. And, in order to secure freight, he was bound to proceed or send on the cargo. It was "imperative" upon him if any other vessel was in port or near. And in default of these, he should have sent it by wagons; these being the only regular means of transportation. (3 Kent's Com. 209, 313, 228; Welch v. Hicks, 6 Cowen, 504.)

There was no such acceptance of the cargo by the owners, "voluntarily," "with the consent of the master," as would make them liable for *pro rata* freight. They were forced to take it, by the misconduct of the master, for self-protection, at great expense and inconvenience, which they might have avoided by selecting other conveyance. (3 Kent's Com. 229; Harton v. Union Ins. Co., 1 Wash. C. C. R. 530; Welch v. Hicks, 6 Cowen, 504.)

*McCoy & Nicholson*, for appellees. It was proved on the trial of this cause in the Court below, that Haught *et al.* were employed by C. W. Adams & Co., to transport a lot of cotton freight from Dallas to Galveston; that Haught commenced the execution of his part of the contract. This freight was to be delivered at Galveston, but no time was specified within which that was to be done. When a contract is silent as to the period of performance, the law infers an engagement that it shall be done and executed within a reasonable time. (See

Chitty's Contracts, 4th Am. ed. p. 563.) A reasonable time in this case, was not until the water should be sufficiently high for the boat to pass down over the raft. When Haught arrived at Porter's Bluff the river was falling very fast, and he found it blocked by a raft just below that place. He then secured the only accessible house at the Bluff, and stored the freight until there should be rise sufficient to let him pass down with his boat. One witness said it was impossible for the boat to have gone down at that time; another said it might have been taken down with difficulty. The peculiar province of the jury is to decide upon the weight of testimony, and they chose to believe the former statement. Where there is a conflict in the testimony, the verdict of the jury will not be disturbed, is a principle too well established to be controverted.

If other means to forward the cargo can be procured, the master must procure them, or lose his freight. (See 3 Kent, Mar. p. 210.) The steamboat Nick Hill arrived at Porter's Bluff a day or two after Haught landed there, but effected her passage by the aid of many citizens, and was eighty hours coming five miles. She did not leave the Bluff until after the cotton was removed by C. W. Adams & Co. So Haught had no opportunity of re-shipping or forwarding the cargo.

The master is not bound to go to a distance to procure another vessel, and encounter serious impediments in the way of putting the cargo on board another vessel. His duty is only imperative when another vessel can be had in the same or a contiguous port. (3 Kent, Mar. p. 213.)

The cotton got wet on its way to Porter's Bluff, for it was in evidence that it rained much upon it, and that caused the bagging and rope to rot, and induced the damage that appellants complain of. But they saw and knew well the boat which was to carry their cotton, and knew there was no provision for sheltering it from the weather before they shipped. Hence, whatever damage the cotton suffered from being wet (and the character of damage proved shows that it was all the result of the cotton getting wet) C. W. Adams & Co. must sustain. (10 Tex. R. 346, and authorities there cited.)

C. W. Adams & Co. took the cotton *vi et armis* from the possession of Haught, and thus prevented him from completing his part of the contract. In all cases the promiser will be discharged from liability if the promisee do any act which renders it impossible for the former to perform his engagement. (Chitty's Contracts, 570 ; 1 Bay's R. 225.)

Mr. Justice Story, in the case of the ship Hooker, (U. S. C. C.) laid down the general rule, that freight for the entire voyage could only be earned by a due performance of the voyage, and that the only acknowledged exception is, where there is no default or inability of the carrier ship to perform the voyage, and the ship owner is ready to forward them ; but there is a default on the part of the owner of the cargo, or he waives a farther prosecution of the voyage. (3 Kent, 219, n.) The statement of facts shows " that Haught's boat was well " manned, and the delay was caused by said boat encountering " a raft ; that W. A. Gold, for C. W. Adams & Co., exercised " control over the cotton, and had a part of it hauled off." Then certainly this case falls under the exception above. C. W. Adams & Co. waived the further prosecution of the voyage by Haught, or were guilty of a tortious act, in taking the cotton out of his possession. In either event they prevented Haught from complying with his engagement, and the entire freight for the voyage was due him. His delay was caused by the dangers of navigation, and they were excepted in the bill of lading. Parties can make what exceptions they please in bills of lading. (2 Kent, 606.)

*Burford & Good*, also, for appellees.

WHEELER, J. The plaintiffs brought suit for the full amount of freight to which they would have been entitled upon the delivery of the cargo at the port of destination. The verdict rendered was for a less sum. The evidence embodied in the statement of facts affords no criterion by which to apportion the freight *pro rata itineris* ; and it is not perceived upon what

Adams v. Haught.

evidence the verdict was rendered for the sum found for the plaintiffs. But if the verdict in this respect should appear to be unsupported by evidence, it would still be material, in reference to the ultimate decision of the case, as it is to its present disposition, to determine what were the rights of the plaintiffs, as to the recovery of freight, upon the facts of this case ; and whether they were entitled to recover full freight for the voyage, or freight *pro rata* for the part of it which had been performed when the cargo was taken possession of by the owners.

The general rule is, that the delivery of the goods at the place of destination, according to the bill of lading, is necessary to entitle the owner of the boat to freight. "The con-"veyance and delivery of the cargo is a condition precedent, "and must be fulfilled. A partial performance is not sufficient, "nor can a partial payment of ratable freight be claimed, ex-"cept in special cases, and those cases are exceptions to the "general rule, and called for by the principles of equity." (3 Kent, Com. 219.) "The contract for the conveyance of mer-"chandize is, in its nature, an entire contract ; and unless it be "completely performed, by the delivery of the goods at the place "of destination, the merchant will, in general, derive no benefit "from the time and labor expended in a partial conveyance, "and consequently be subject to no payment whatever. The "cases in which a partial payment may be claimed, are excep-"tions founded upon principles of equity and justice, as appli-"cable to particular circumstances." (Abbott on Shipping, 405–6, 6 Am. ed.) If, however, the owner of the cargo is the cause of its not being transported to the port of destination, full freight may be recovered. If, in case of disaster, he will not allow the master a reasonable time to repair, or to proceed or transport the goods in another vessel, the master will be entitled to the whole freight, because the owner is the cause of preventing the performance of the contract. And generally, it may be stated, that if the non-delivery of the cargo at the port of destination has been occasioned by no default of the

carrier vessel, but has been occasioned by the default or waiver of the shipper, full freight may be recovered. For in the one case the shipper cannot avail himself of his own default to escape the payment of freight; and in the other, he dispenses with the entire fulfillment of the contract for his own interest and purposes. (Ib. n.) And when the vessel is, from inevitable necessity, detained at an intermediate port, and unable to prosecute the voyage, and the goods are there voluntarily accepted by the owner, freight is to be paid according to the proportion of the voyage performed, and the law will imply a contract to that effect. (Id. 455, n.; 3 Kent, Com. 228–29.)

It is, upon these principles, insisted for the appellees, that they were entitled to recover freight in this case. They maintain that they were prevented by inevitable necessity, from proceeding with the cargo, and not from any default of theirs; and that before they were able to proceed, it was taken possession of by the defendants, and that it was in consequence of their default that the cargo was not delivered by the plaintiffs at the port of destination. This view of the case, however, we think, is not supported by the record. In the first place, it is far from being satisfactorily shown that the plaintiffs might not have proceeded with their boat; and this should not have been left doubtful. For, as common carriers, they are held to a very strict accountability. And in the next place, the opportunity appears to have been afforded, of employing another boat to convey the cargo to the port of destination. And no reason is assigned for their failure to do so, except that they could not agree with the master of the boat, as to the terms. But it does not appear that it was not their own fault that they could not agree, or that the master of the vessel would not undertake the transportation of the goods, upon reasonable terms. "If there be another vessel in the same or a contiguous port, "which can be had, the duty (says Kent) is clear and impera- "tive, upon the master, to hire it." (3 Kent, 213.) Yet, "the "master may refuse to hire another vessel and insist on repair- "ing his own; and whether the freighter be bound to wait for

" the time to repair, or becomes entitled to his goods without
" any charge of freight, will depend on circumstances.   What
" would be a reasonable time for the merchant to wait for re-
" pairs, cannot be defined, and must be governed by the facts
" applicable to the place and time, and to the nature and con-
" dition of the cargo.   A cargo of a perishable nature may be
" so deteriorated as not to endure the delay of repairs, or to
" be too unfit and worthless to be carried on." (Id. 213.)   The
evidence shows that the cargo, in this instance, was of a perish-
able nature, and was already considerably damaged by the ex-
posure incident to the mode of transportation adopted.   And
it was very evident, that if it remained in its then condition, it
must be greatly damaged ; as, in fact, it was.   If, as the plain-
tiffs allege, they could not proceed with their boat, in conse-
quence of the want of a navigable stage of the river, and the
prospect of such a stage was so remote as to warrant them in
putting the cargo ashore, and returning to their distant homes,
leaving the cotton, it might be, to rot in its insecure place of
storage, before they would be enabled to proceed with it to its
place of destination, it cannot admit of a question, that it was
their imperative duty to employ the vessel, then accessible, to
carry it on, if practicable ; and, in case of their failure to do
so, it was the undoubted right of the owner, under the circum-
stances, to take possession of and forward it himself, dis-
charged of any liability to the plaintiffs for freight, either for
the whole or a part of the voyage.   However it might be as to
the liability of the plaintiffs for the damages sustained in con-
sequence of their failure to prosecute the voyage, or to re-ship
the cargo, it is very clear that they were not entitled to freight.
" To entitle himself to freight, the master must proceed or offer
" to proceed in another vessel, or repair his own and take on
" the cargo ;" (Id. 228 ;) otherwise he will not be entitled to
freight, because he has not performed his contract.   If the
plaintiffs could not proceed, as the cargo was of such a nature
as would not admit of an indefinite delay, without a partial if
not a total loss to the owners, they were bound to employ some

other means of transportation, or forfeit their claim for freight.

No fault can be imputed to the owner, for taking possession of the cotton, and procuring other means of transportation, when the prosecution of the voyage had been thus abandoned by the plaintiffs. Under the circumstances, they would certainly have been fully warranted in taking charge of it at once, for their own protection. Months elapsed before they did take charge of but a small portion of it. It was deteriorating, and when taken possession of, had deteriorated half its value. Surely they were not bound to let it remain there indefinitely, while the carriers were waiting, at their residence, for a return of the season which would bring a rise in the river, and enable them to proceed to the port of destination with what would then be a rotten and worthless cargo.

Nor can it be said that the acceptance of the cargo by the defendants was, under the circumstances, voluntary. It was forced upon them by the necessity of the case, for their own protection from a total loss of the cargo. It was said by the Supreme Court of New York, in the case of Welch v. Hicks, (6 Cowen, 503, 510,) that "Where the master refuses to repair "his ship and send on the goods, or to procure other vessels "for the purpose, and the owner of the goods then receives "them, this is not such an acceptance of the goods as will en-"title the ship owner to a *pro rata* freight. It is not a volun-"tary acceptance. He does not elect to receive the goods at "the intermediate port, and sell them there, or become his own "carrier to the port of destination. He does not assent to the "termination of the voyage at the intermediate port; but it "having been terminated there against his will, by the refusal "of the master to send on the goods to the port of destination, "he does not, by receiving them under such circumstances, in "judgment of law, promise to pay the freight to the interme-"dtate port." And so in the present case, it cannot in justice be said that the defendants elected to receive the goods at Porter's Bluff, or that they assented to the termination of the voyage there, and thereby, for their own advantage, waived

their right to have them transported by the plaintiffs to Galveston. But the voyage having been terminated there, against their will, by its indefinite postponement by the plaintiffs, and their omission to send on the cotton, the defendants had no alternative left them, but to receive and transport it to the place of destination themselves, or suffer its total loss. Under the circumstances of the case as disclosed in evidence, the plaintiffs do not appear to have been equitably entitled, nor will the law imply a promise on the part of the defendants, to pay freight proportionately to the part of the transportation performed. For, as we have seen, to raise such an implied contract, and entitle the carriers to freight *pro rata itineris*, the acceptance of the goods by the owner must have been voluntary. (3 Kent, 229 ; Abbott on Shipping, 455, n.) The case of Luke v. Lyde, (2 Burr. 882 and 1 Black. R. 190,) which appears to have been the leading case upon this subject, and for a time to have possessed a decisive authority and controlling influence upon the course of decisions, seems, it is said, to have been at first understood to justify the claim of a *pro rata* freight, whether there was a voluntary or compulsive acceptance of the goods by the owner of them, at an intermediate port. But in the case of the Marine Ins. Co. v. United Ins. Co. (9 Johns. R. 186,) it was held, that to give a title to freight *pro rata*, there must be an unequivocal, voluntary and unconditional acceptance of the goods by the owner, at the intermediate port, so as to form the basis of a new contract to pay a ratable freight. And in the case of the Armroyd v. The Union Ins. Co. (3 Binn. 437,) the Court held that, to raise the implication of a new contract to pay a *pro rata* freight, it was necessary that the goods should have been accepted by the freighter or his agent voluntarily ; for that if they were in that situation that the agent or supercargo takes them against his will, and sells them for the benefit of whom it may concern, no freight can be recovered. The same doctrine was held by Mr. Justice Washington in Hurtin v. Union Ins. Co., (1 Wash. C. C. 530,) and by the Supreme Court of Pennsylvania in Cal-

lender v. Ins. Co. of N. Am. (5 Binn. 525,) and Grey v. Waln. (2 Serg. & R. 229.) And the principle of these cases has been affirmed by the Supreme Court of the United States. In Caze v. Baltimore Ins. Co. (7 Cranch, 358,) the Court said, "The "whole class of cases resting on the authority of Luke v. Lyde "proceed on the ground that there is a voluntary acceptance "of the goods themselves at an intermediate port, and not as "in the present case, (a case of capture) a compulsive receipt "from the hands of the Admiralty, after capture and condem- "nation, and ultimate restoration upon the appeal. There is "in our judgment no equity to support such a claim, and "although it received some countenance from some remarks in "Bailey v. Mandighane, the current of more recent authority, "as well as principle, clearly point the other way." The same principle was asserted by the Supreme Court of New York in the case before cited from 6 Cowen. And it is doubtless the settled American doctrine, and well settled upon principle. For there can arise no implication of a contract to pay freight from any other than a voluntary acceptance of the goods or their proceeds. The plaintiffs, therefore, were not entitled to recover full freight, for the reason that they did not perform the contract on their part; nor was their failure occasioned by any default or waiver by the defendants. They were not entitled to recover freight *pro rata itineris*, for the acceptance of the goods by the owners, at the intermediate port, was not voluntary, and of their own election, but forced upon them by the necessity of the case, occasioned by the plaintiffs' failure to complete the transportation of the goods to the port of desti- nation. The verdict, therefore, was contrary to law and the evidence.

Upon the question of the ability of the plaintiffs to proceed from the point at which they appear to have abandoned, indef- initely, the transportation of the goods in their own boat, as the evidence was conflicting, we might hesitate to disturb the verdict. Though, if they were only waiting for a rise in the river, it appears that that event did occur before the cotton

was removed by the defendants; and no reason is assigned for their failure to take advantage of it, to complete the performance of their undertaking. But, whatever justification they may have shown for the failure to proceed with their own boat, they have shown none whatever for not availing themselves of the opportunity which appears to have been afforded, of re-shipping the goods to the port of destination; as, to entitle them to freight, they were bound to do. And, upon this point, the verdict is wholly unsupported by evidence. We are of opinion, therefore, that the Court erred in refusing a new trial, for which the judgment must be reversed and the cause remanded.

Reversed and remanded.