## Case No. 9,955.

### MURRAY v. AETNA INS. CO.

[4 Biss. 417.][1]

Circuit Court, N. D. Illinois. Oct., 1864.

AFFREIGHTMENT — TEMPORARY RETARDATION — WHETHER FREIGHT EARNED — MARINE INSURANCE—FREIGHT MONEY.

1. A temporary retardation, and subsequent sale of the cargo by the owner, does not constitute an abandonment, nor deprive the carrier of his right to the freight money; he therefore, cannot recover from the insurer of the freight money.

2. Where a vessel takes a cargo late in the season, for transportation around the Lakes, and is laid up by stress of weather, it is her duty to complete the voyage in the spring, if practicable, and carry the cargo to its destination.

3. If a cargo is necessarily unloaded at an intermediate point, and the owner sells it there, though the vessel might have carried it in the spring, the carrier has earned his freight.

Assumpsit [by James Murray against the Aetna Insurance Company of Hartford] for loss of freight money.

Robert Rae, for plaintiff.

DRUMMOND, District Judge. I am of opinion as a matter of law that the plaintiff cannot recover in this case.

The contract the defendant made was that the vessel should earn or be entitled to freight, and in the case of loss of freight or if the plaintiff was not entitled to receive freight in consequence of some accident or misfortune within the terms of the policy,

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

then the defendant agreed to become responsible. The question is whether, according to the terms of the contract, the defendant is liable.

Fifteen thousand bushels of corn, in the fall of 1862, were shipped on board the schooner owned by plaintiff to be transported from Chicago to Kingston, and it was the freight list on this corn that was insured by defendant. A marine disaster happened to the vessel. She was dismasted and was towed into the port of Goderich, in Canada. The vessel lay there some time. The hatches were then taken off, and it was found that the corn was damaged more or less. Of course the schooner in the condition in which it then was could not proceed on her voyage without repairs. The corn was unloaded from the vessel, and placed in a warehouse, and the sound corn separated from the damaged corn. Shortly after it was so placed, it being in different stories of the warehouse, the warehouse broke down and the corn became again intermingled. There was a policy of insurance on the cargo by the Corn Exchange Company, and upon the receipt of intelligence of the disaster the agent of that company proceeded to Goderich with a view of determining what was to be done for the best interests of all concerned. The proof shows that about thirteen thousand bushels of the corn were in a sound condition when it was landed from the vessel, the remainder being more or less damaged. There is some conflict of evidence as to the manner and circumstances under which the corn was sold. The captain of the schooner claims that the corn was sold by the agent of the Corn Exchange Company. The latter, on the contrary, claims that the corn was sold by the captain. I do not think it is material which was the fact, but we will assume, what is undoubtedly true, that it was sold by the common consent of both. The plaintiff retained two thousand two hundred dollars, and the balance of the proceeds was paid over to the agent of the Corn Exchange Company. It is immaterial what was the fact as to the manner in which this money was paid or received. Of course if it was paid and received as freight it could not again be recovered; but, according to the view the court takes. it is immaterial whether it was or not. It seems to be conceded that there was no material injury done to the hull of the schooner; that the chief injury was to the spars and rigging. We have to assume, of course, under the finding of the jury, that the vessel could not have been repaired in the port of Goderich that fall, and there is no dispute but it could have been repaired in the following spring or during the winter, and that the vessel would have been ready upon the opening of navigation to proceed on her voyage. The question is, whether, under the circumstances of the case, it was not the duty of the captain to go on and complete his contract, which was to transport the corn from Chicago to Kingston.

When a vessel takes a cargo, as in this case, in the fall of the year to transport to a distant point, it is one of the incidents of the navigation that owing to variable weather or freezing up. she may not be able to reach her port of destination. The mere fact that the vessel is not able to do so does not relieve the carrier from completing his contract and thus becoming entitled to his compensation. Neither here does the fact that the vessel was dismasted and was obliged to make a port of safety and the corn had to be unloaded, relieve the carrier from the duty of completing his contract, provided by proper repairs the vessel could have proceeded in the spring of 1863. The corn was in such a condition that it could have been transported in whole or part in specie, and could have reached the port of destination.

This being so, then it follows as a conclusion of law that if the owner of the corn chose to take it or have it sold he could not deprive the plaintiff of the right to the freight.

There is no controversy but that the vessel could have been repaired in the winter of 1862 or the spring of 1863. There can be none under the proof but that the corn could have been transported in specie, in whole or in part at least. to the port of Kingston. in the spring of 1863. Those facts being admitted, upon well-settled principles of law I think the plaintiff cannot recover.

Among the numerous authorities which have been referred to, I will only advert to three. The first is the case of Anderson v. Wallis, reported in 2 Maule & S. 240. That was a case of insurance upon a cargo and in that respect was different from this. The ship sailed from London on the 16th of September, 1811, bound for Quebec. Having encountered heavy gales, so that she made a great deal of water, the master was obliged to return (having proceeded a considerable distance on the voyage) to the port of Kinsale. Ireland, and arrived there October 25th. On the arrival of the ship it was found necessary to make repairs upon the vessel before she could proceed on her voyage. These repairs were not completed until the 25th of March following. On examination it was ascertained that the cargo was damaged. and it was sold as a damaged cargo. Prior to this time the insured abandoned the cargo to the underwriter. The underwriter refused to accept the abandonment, so that the question arose whether there was a loss within the true construction of the policy. The court held there was not. Why? Because the goods were not lost, and because the vessel could have been repaired and could have proceeded on her voyage in the spring of 1812 to Quebec. The time that elapsed was from October 25 until March following, when the vessel should have so proceeded, and it was held—Lord Ellenborough delivering the opinion—that it was a mere retardation of the voyage. Now if in this case the cargo had

been destroyed so that it lost its identity, and it did not in point of fact exist in specie, then, as a matter of course, it would have been a loss within the policy, and the court would have held that the insured was entitled to recover; but the cargo remaining in specie, although in a damaged state, the carrier having a right when the repairs were made to go on and complete the voyage, the property being sold as a damaged cargo, there was not a loss within the meaning of the policy.

The principle, although that was a case of insurance on the cargo and the case at bar is a policy on the freight, must necessarily be the same as to the question of loss. Here, as there, the agreement was to indemnify the plaintiff in case of loss—in one the loss of the cargo, in the other of freight—and in that case the court held that there was not a loss within the meaning of the policy, as we must hold here. The language of the court in that case has been cited with approbation in subsequent cases, and no court has ever yet decided that a temporary retardation is a total abandonment. Disappointment of arrival would be a new idea of abandonment in insurance law.

Here the question is, whether the loss of freight was in consequence of a peril of the sea or of the voluntary act of the master, and the answer is, it was the voluntary act of the master.

The next case to which I shall advert is the case of Jordan v. Warren Ins. Co. [Case No. 7,524]. That was a case of a policy upon freight precisely like this. The freight insured was a quantity of cotton, tobacco, and other articles of merchandise from New Orleans to Havre. The freight bill was nearly $10,000. The vessel proceeded from New Orleans down the Mississippi and on her progress to the Gulf of Mexico on the 7th of June she met with an accident which rendered it necessary for the vessel to return to New Orleans for repairs. The vessel was fitted again for sea on the 21st day of July following, a little over a month. On examination it was ascertained that the cargo was injured, and it was taken out; a large portion of it was sold at public auction for the sum of nearly $20,000. The residue, being in a sound state, was shipped for Havre in another vessel. Mr. Justice Story upon these facts says the ship was repaired and capable again of taking a part of the cargo at New Orleans within a reasonable time, and the master had a right to require that it should be so taken on board and carried on the voyage as soon as it might be in a condition to be safely re-shipped, and he had a right to wait until the cargo could be dried, sorted, re-packed and prepared for re-shipment; the delay arising thereby would be a mere retardation or temporary interruption or suspension of the voyage, and not an utter prostration or destruction (prostration is a bad word to be used in that connection I think). If, then, the freight has been lost,

it has been lost by his own voluntary act, and not by the necessary operation of any of the perils insured against. The whole testimony shows the cargo could have been dried, assorted and re-packed for the voyage at the farthest within six months. It is true that the vessel was ready, so far as the repairs were concerned, within about six weeks; but he says the proof shows the cargo could have been ready in six months, and what was the consequence? That the party was entitled to his freight, and consequently the underwriter was not responsible as for a loss of freight. He proceeds: "Mere delay in the voyage or disappointment as to time never constitutes, as we have seen, any ground for the abandonment of the voyage."

The next case is Hugg v. Augusta Insurance & Banking Co., 7 How. [48 U. S.] 595. That was also a case of insurance on freight like this. It went up on a certificate of difference of opinion between the judges below. The vessel in that case took a cargo of jerked beef at Montevideo to be transported to Matanzas or Havana. It was the freight on this cargo that was insured against. The vessel met with a disaster, and was obliged to put into the port of Nassau. Some of the cargo was thrown overboard, and another portion of it was found in so offensive and damaged condition that the authorities at once refused to have it landed. Another portion of it was sold, and the question in this case was, whether the underwriter was liable as for a loss of freight. Various questions were certified to the supreme court. Upon the first question the court held that if the jury found that the beef was a perishable article within the meaning of the policy, the defendant was not liable as for a total loss of the freight unless it appeared that there was a destruction in specie of the entire cargo, so that it had lost its original character at Nassau, the port of distress, etc.

Admit that in the case at bar it was for the interest of the owner of the cargo or of all parties that it should be sold, still, if the vessel could have been repaired in the following spring, and have proceeded on her voyage from the port of Goderich, and could have transported the corn in specie to the port of Kingston, the plaintiff could not recover against the underwriter for a loss of the freight. The case last cited, and all the other cases, I think settle that.

As to whether it was a reasonable time or not. That question I think is also decided by the authorities and upon principle. Independent of authority the plaintiff cannot recover in this case, because if he could it would be substantially holding that where there was a detention of a cargo shipped in the fall, in consequence of stress of weather, or frost or other causes. so that the cargo could not arrive at the port of destination till the following spring. there was a loss of freight, and that the insured should proceed at once against the underwriter for the freight. That would be an exceedingly dangerous doctrine to hold, so far as the commerce of the Lakes is concerned. So that it resolves itself after all into, what was the reason there was a loss of freight, if there was such a loss? The only answer that can be given is, if there was a loss, it was in consequence of the voluntary act of the master, and not because of a peril of the sea; so that the verdict will have to be, as a matter of law, for defendant in this case.

See further that the master has a right to wait till the cargo is ready for forwarding, and in case of his failure so to do, the insurer is not liable. Herbert v. Hallett, 3 Johns. Cas. 93; Griswold v. New York Ins. Co., 1 Johns. 205; Saltus v. Ocean Ins. Co., 14 Johns. 138; Clark v. Massachusetts Fire & Marine Ins. Co., 2 Pick. 104; M'Gaw v. Ocean Ins. Co., 23 Pick. 405; Lord v. Neptune Ins. Co., 10 Gray, 109; Mordy v. Jones, 4 Barn. & C. 394; Tio v. Vance, 11 La. 199; Adams v. Haught, 14 Tex. 243; The Ship Nathaniel Hooper, 3 Sumn. 542, Fed. Cas No. 10,032.

It seems to be universally held that the master has the power to forward the cargo in another vessel, if his own becomes unable to complete the voyage: but whether he is bound to do this. is unsettled in England, though American authorities hold the affirmative. See Hugg v. Augusta Insurance & Banking Co., supra; and a collection of cases in 1 Pars. Shipp. & Adm. 234, note 2: Hugg v. Baltimore & Cuba Smelting & Mining Co., 35 Md. 414.

For a full discussion of right of the master to deliver the cargo at an intermediate point, on payment of freight for the full passage, and of his obligation to so do on tender of the freight, see 1 Pars. Shipp. & Adm. 231, notes 2 and 3.

Where the insurer voluntarily accepts the damaged cargo at an intermediate point, the master is entitled to freight pro rata itineris. The Mohawk, 8 Wall. [75 U. S.] 153.